SURPLUSAGE.—Surplusage does not vitiate an indictment. People v. Lawrence, 10 N. Y. Cr. 332; 137 N. Y. 517; 51 S. R. 286.

USURY.—An indictment for usury, under section 378 of the Penal Code, must charge the usurious agreement, specifying its terms and the particular facts relied upon to bring it within the prohibitive clause of this section. People v. Hubbard, 9 N. Y. Cr. 413; 63 S. R. 399.

WAIVER.—An objection to their joinder in one count in an indictment is waived by a failure to demur to it on that ground. People v. Tower, 10 N. Y. Cr. 95; 42 S. R. 164.

## Court of Appeals.

October 24, 1899.

## PEOPLE v. HOWARD C. BENHAM.

1. HOMICIDE — CORPUS DELICTI.

The corpus delicti, in the case of murder or manslaughter, means the body of a crime, and is divided into two components parts; the first of which is the death of the person, and the second is that the death is produced through criminal agency. The first must be established by direct evidence, and the latter by direct or circumstantial evidence, to the satisfaction of the jury, beyond a reasonable doubt.

2. SAME — OPENING OF DISTRICT ATTORNEY.

It is the right and duty of the counsel representing the people, upon the commencement of a criminal trial, to make a statement to the jury of the evidence that he expects to present, and the claim that he wil make with reference thereto, to the end that the jury, upon listening to the evidence, may better understand and appreciate its connection and bearing upon the case.

3. SAME.

The fact that, in making a statement of the evidence, the counsel in some instances stated what the evidence would show, is not error where he called the attention of the jury to the fact that it would not be proper to anticipate in detail the testimony of witnesses, and that he might misquote or give a forced construction to it, whereby he indicated that he was proceeding to state his understanding of what the evidence would be. (In case the jury was not misled thereby.)

4. SAME — SUMMING UP.

Where, in summing up in a prosecution for murder of defendant's wife, the district attorney exceeds the bonds by characterizing the defendant as a seducer, he sufficiently retracts the statement by asking the jury to disregard and forget what he has said, and to only consider the evidence upon the subject.

5. SAME — ORDER OF TRIAL.

The Code expressly gives to the court the power, in its discretion, in furtherance of justice, to permit evidence to be received out of its order, and upon the original case, even after a party has rested, if it is before the case is finally submitted.

6. SAME — EVIDENCE — BAD CHARACTER.

Evidence which is taken merely to show previous bad or vicious character is inadmissible; but if it tends to prove or establish any fact at issue upon the trial, it is competent, even though it tends to degrade the party.

7. SAME — MOTIVE.

Where the defendant is charged with the murder of his wife, motive becomes an important consideration, in determining the question whether he is guilty.

8. SAME — LOSS OF AFFECTION.

Though a man may privately consort with a prostitute without the loss of affection for his wife, but where the transaction commences in a village where the defendant and his wife reside and are well acquainted and is continued at a hotel where they both are well known, openly and notoriously, and under such circumstances that it can hardly fail to come to the attention of his wife and neighbors, thus exposing his conduct and infidelity, the jury may fairly and reasonably infer from the transaction that the relations between the defendant and his wife are not agreeable, and that there is, upon his part, a lack of affection and respect for her,

9. SAME — QUARRELS.

The admission of testimony as to quarrels between the defendant and his wife two years before her death, taken in connection with the whole history of the case, and with the treatment of the deceased by the defendant, continuing down to the time of her death, is properly received.

10. SAME.

Among the circumstances from which malice in the killing by a husband of his wife may be inferred is that of long continued ill treatment.

11. SAME — EXPERT TESTIMONY.

Evidence of physicians who were present and took part in the last autopsy held upon the body of the deceased, that they did not see any evidences of disease other than the conditions described by them, and that they did not discover any natural cause of death, is competent where they frankly stated to the jurors the extent of their examinations and what they saw.

12. SAME.

A physician may be permitted to testify that there were pathological conditions found in the body of the decedent which, to the best of his belief, indicated the effect of prussic acid, where he is a graduate of a medical college, and has read the authorities upon the subject of the effect of prussic acid.

13. SAME — EVIDENCE.

The admission in evidence of the names of the jurors who sat upon the inquest, was harmless to the defendant, where the verdict of the coroner's jury was not received in evidence.

14. SAME — CHARGE.

The court, having once charged a proposition of law, can retract it and correct the charge made, before the jury has determined any of the issues of the case.

15. SAME — REQUESTS.

Requests, which require facts to be established by evidence equivalent to "absolute and positive proof," are properly refused.

16. SAME.

So, requests, which are to the effect that if there be "any doubt," whether it amounted to a reasonable doubt or not, the jury should acquit, are properly refused.

17. SAME.

So, requests, which are merely argumentative, calling upon the judge to instruct the jurors that such circumstances were entitled to great weight in their minds, are improper.

18. SAME.

A request that the chemical tests of an expert are valueless for the determination of the finding of prussic acid in the body of the deceased, or his truthfulness be doubted, then no inference can be drawn from his testimony, and proof of death by prussic acid is wanting, and the defendant should be acquitted is improper where the latter part of the request entirely ignores the testimony of another expert, who was present, assisted in, and witnessed one of such tests.

19. SAME.

Where the opinion of experts is based upon a group of pathological symptoms evidencing to them death by prussic acid poisoning, and a request instructs the jury that the testimony of these physicians must be considered valueless and disregarded, if one of the symptoms enumerated should be disproved, the disproof of one symptom may not totally destroy it, so that their testimony should be wholly disregarded by the jury.

20. SAME.

Where matter, embraced in a request, has been fully and sufficiently submitted to the jury, there is no need of further instruction upon this branch of the case.

21. SAME.

Where requests might properly have been charged, but the substance was so nearly covered in the body of the charge that it cannot be held that harm has been done, or that all the rights of the defendant have not been protected, they constitute technical errors or defects, which are of such a character that they should be disregarded, under § 542 of the Code of Criminal Procedure.

22. SAME — MOTION IN ARREST.

A motion in arrest of judgment and for a new trial, made upon the grounds that there was misconduct on the part of a juror, is properly denied where a number of witnesses made affidavit to conversations had with him prior to his selection as a juror, in which he is said to have made statements which, if true, would have disqualified him from sitting as a juror, but which the defendant strongly denied, and a question of fact is thus presented which has been disposed of by the trial judge, who appears to have believed the statement made by the juror.

APPEAL from the judgment and an order denying his motion for a new trial.

W. F. Mackey and W. E. Webster, for appellant.

Frederick S. Randall, Dist. Att'y, and Myron H. Peck, Jr., for the People.

HAIGHT, J.—The defendant, Howard C. Benham, was indicted by a grand jury of the county of Genesee for the crime of murder in the first degree, which was charged to have been committed at the town of Batavia, in said county, on the 4th day of January, 1897, by administering to Florence Tout Benham a quantity of hydrocyanic acid, commonly called "prussic acid," with the deliberate and premeditated design to effect her

death, from which she died at that time. The defendant was brought to trial upon the indictment at a term of the supreme court held in and for the county of Genesee on the 21st day of June, 1897, which resulted in a verdict finding the defendant guilty of the crime charged in the indictment. A motion for a new trial was then made, upon the grounds that the verdict was against the law and the evidence; that the jurors, or some of them, were guilty of misconduct, and were not proper persons to sit upon the trial; and upon the ground of newly-discovered evidence. The motion was denied, and on the 11th day of September, 1897, the sentence required by the statute was imposed.

Florence Tout Benham was born July 11, 1876, and was married to the defendant August 4, 1892, at the age of sixteen years. After her marriage with the defendant they first began keeping house at Byron, Genesee county, but subsequently removed to Batavia. In December, 1894, she gave birth to a boy, and at the time received an injury which did not fully heal, and an opening remained between the vagina and rectum, through which a portion of the rectal contents discharged. Some of the evidence tends to show that, notwithstanding this, she recovered her normal health. In April, 1896, she was again sick, complaining of a pain and tenderness in the lower part of the abdomen, and was attended by Dr. Townsend, who diagnosed her case as pelvic peritonitis. He prescribed rest in bed, a fluid diet, and two grains of morphia, with thirty grains of phenacetine, to be divided into twelve powders, with directions to take one powder in four or six hours, as long as the pain continued. She recovered from this sickness, and was again apparently in her usual health, riding her wheel, visiting the stores in the village, and attending to her household duties, and so continued until Christmas night. On that night she was taken sick, but no doctor attended her until the afternoon of the 27th, when Dr. Tozier was called, and informed that she had been vomiting. He examined her, and found her pulse and temperature normal, and discovered no objective symptoms of disease. He left a prescription, with some directions as to her diet, and went away. The next morning he left some

chlorodine tablets, containing a twelfth of a grain of morphine. That evening he found such symptoms of morphine that he directed the use of the tablets to be discontinued. The next morning he found further symptoms indicating that she had taken morphine, and he had a talk with the defendant with reference to it, who then took out of his vest pocket a powder of morphine, and said that he found it under her pillow, that Dr. Townsend had prescribed it for her on a former occasion when she was sick, and that she had taken it ever since. The doctor then said that was the cause of her present trouble, that she must not take any more, and that he would have a talk with her about it. The defendant requested him not to do so, saying that she would be very much mortified to have it known that she took morphine. The doctor then told him that she must have a nurse to watch her, and the defendant said that her mother was coming, and that a nurse would not be necessary. The next morning he discovered still more morphine symptoms, and describes her as restless, and constantly pushing something from her face. The defendant then showed him a box of morphine powders which he said he had found, and remarked that she had become a morphine fiend. The doctor then spoke again about a nurse, and defendant said her mother was coming that evening, and would not care to have one around. The mother came, and remained until the evening of the 31st, when she returned to her home. On the morning of that day the doctor found her apparently better, and did not observe any further symptoms of morphine. He did not call again until evening, and after her mother had gone. At about eight or half-past eight o'clock in the evening he received a telephone message, and went over to the house, and found her in a state of collapse. Mrs. Prentice was working for defendant as cook, and Kline as coachman, and both were in the dining room. Benham asked Kline if he would stay in that night, and Kline said, "All right." Benham then said, "Wait a few minutes," and went upstairs. They soon heard Mrs. Benham scream at the top of her voice. The defendant called Kline, and he and Mrs. Prentice went upstairs. They found the decedent in bed, with her hands drawn up, her fingers twisted, and her eyes

bulged out and rolled upward. She drew up her legs, and pushed them down against the footboard, threw her hands and struck them, and seemed to be in great distress. She continued throwing herself and screaming for about fifteen or twenty minutes, frothing at the mouth, and then commenced vomiting. Before she vomited they noticed a strong and offensive odor from her breath, which they had never observed before. Mrs. Prentice and Mr. Kline rubbed her hands and arms, and tried to ease her, until the defendant went to the telephone and called the doctor, who shortly afterwards arrived. After vomiting, Mrs. Benham appeared to regain consciousness, and called for her mother and her boy, and said to defendant: "Too strong, too strong. I told you it was too strong." During this time the defendant paced the room, chafing his hands, and appeared to be greatly excited. He said the attack occurred while he was getting her out upon the commode, to which she replied that she had no recollection of getting out of bed. After the arrival of the doctor he gave her a nitroglycerin tablet, and examined her pulse, but was unable to find any. He then watched a few seconds, and, getting no response from the pulse, injected into her arm some brandy, and soon found a feeble pulsation. He says that upon his arrival she was lying upon her right side, with a moderate cyanosis of the face and lips, which is occasioned by the stoppage of blood in its circulation. He found her feet cold, and caused cans to be filled with hot water, which he placed between her legs, at her feet, and on either side of her heart, when she quickly rallied, and within ten or fifteen minutes was practically out of danger. He remained for some time, until she had apparently fully recovered, then, leaving some of the nitroglycerin tablets with instructions to use one in case she should have another attack, went home. He tells us he was unable to account for the condition in which he found her. Mrs. Prentice remained with her the rest of the night. The next day the defendant went to her with a cup in which there was medicine, and said that Mrs. Benham would not take it from him, and wished her to go upstairs and give it to her. She took the cup, and went up to Mrs. Benham's room, and asked her to take the medicine. Mrs. Benham said to her,

calling her by name, "You wouldn't ask me take it, would you?" She said to her, "Why, I would like to see you get well." Mrs. Prentice then threw the contents out. Shortly after the defendant came into the room, and asked if she had given her the medicine, and she replied in the affirmative. He then stepped into the bath room, came back, and said, "You have not taken that medicine." Mrs. Prentice replied, "Well, it is as well perhaps." To that he said nothing. Mrs. Benham then continued to improve until January 3d. On the afternoon of that day the doctor was passing the house, and, seeing the defendant out at the barn, stopped and inquired how Mrs. Benham was, when the defendant stated that she had had another of those attacks, but that he gave her a nitroglycerin tablet, and she quickly recovered from it. The doctor then said he would go in and see her, but the defendant replied that it was unnecessary, as she was all right. The doctor agreed to call in the evening, and went on. The statement of the defendant to the effect that Mrs. Benham had had another attack that afternoon was denied by the other members of the household. That evening the doctor called about nine o'clock, and, after a partial examination, the defendant asked him if he thought she was very sick, and the doctor replied in the negative. The defendant then said that he thought she was a very sick woman, and thereupon the doctor made a careful and thorough examination of her, and testified that he found nothing abnormal. Her condition was such that he joked her about putting up a job on him, and that he was suspicious of her belonging to a class of ladies that enjoy poor health, and assured her that her heart and lungs were as sound as a woodchopper's. That night about three or four o'clock the defendant called for the doctor at his house, who got up and dressed, had his horse hitched up, and, with the defendant, immediately drove to his residence. He entered, and found Mrs. Benham dead. The mother of Mrs. Benham had arrived on the evening of January 2d, and from her, Mrs. Prentice, and Mr. Kline we have the details of the occurrence.

It appears that the mother of Mrs. Benham retired about ten o'clock that evening, sleeping in the front chamber, and, before

retiring, she had quite a discussion with the defendant as to who should take care of Mrs. Benham during the night. She proposed to take care of her and the little boy, who was sleeping in a room opposite that occupied by Mrs. Benham, saying to him that she would take care of both, and that he could go and lie down and get a good night's rest. He insisted, however, that she should retire, that he would take care of Mrs. Benham himself, and she finally conformed to his directions in the matter. During the night she was awakened by the crying of the little boy, and arose, and went into the room and quieted him. On her way back she stepped into her daughter's room, and found the defendant standing there fully dressed. She asked him what time it was, and he told her one o'clock. She then spoke to her daughter, and asked her if she wanted anything, and she answered, "No," saying, "I am all right." The mother then returned to her room, and the next thing she heard was loud talking in her daughter's room. She heard her daughter say, "Howard, I don't want to take that." The defendant made some reply, the purport of which the mother was unable to hear, after which she heard her daughter again say, "I don't see what you want me to take that for." The defendant again made some reply, which was not heard, and to which the daughter then replied, "I don't care; I think you are just as mean as you can be." In about five minutes defendant called her, and she immediately arose, and went into her daughter's room, and found her dying. She lay on her right side, her head turned over to the left, her eyes were staring up very full, her hands were raised up, and fingers turned around. She took her by the hand, and tried to straighten out her fingers. In the meantime, the defendant was walking around the room, swearing because the hired man did not come. He had called for him, and shortly after he came into the room with Mrs. Prentice. They then commenced to rub her, and tried to straighten out her fingers. The defendant scolded the hired man for not coming sooner, who replied that he came as quickly as he could get his clothes on, and said something about going for a doctor. The defendant told him to stay with Mrs. Benham, and he would go for the doctor. In the meantime an effort had been

made to reach the doctor by telephone, which was unsuccessful. The defendant then went to the doctor's. During his absence, and within fifteen or twenty minutes after the defendant had called the mother, Mrs. Benham died.

Mrs. Prentice heard the loud talking about five minutes before the call was made, but was unable to distinguish the words that were uttered. They all substantially agree as to the condition in which Mrs. Benham was found after they entered the room, and that after her decease it was found that her feet were flexed inward, the soles facing each other, and that the bed had been soiled. It was about three-quarters of an hour before the defendant returned with the doctor. The defendant shortly after entered the room, and appeared to be in considerable excitement and distress. He walked up and down, saying, "My God, it's not a fair deal." He made use of this expression several times, and cried. The doctor tells us that the jaw of the deceased was not in its place, and he raised it up, and procured a napkin, which he tied around the head, so as to hold it in its place. An undertaker was then sent for, who came to the house and took charge of the body. After it had been washed by some neighboring women with embalming fluid furnished by the undertaker for that purpose, he embalmed the body by injecting through the nostrils from a pint to a pint and a half of embalming fluid by means of a bulb syringe inserted in the nostrils, and also by injecting into the abdomen about a quart of the fluid, which was done through a tube or trocar. The undertaker further tells us that at the time he discovered that the face was slightly flushed and a little swollen; that she was a fair-skinned woman, and had a natural look; that the nails of her fingers were black, and that he applied friction to the nails in order to make the blood that had settled there fluid, so that it would disappear, and that in applying friction to the nails he used embalming fluid. He closed the hands a little tighter than they were, and wrapped the fingers up with cloths saturated with the fluid.

It appears that the sudden death of Mrs. Benham caused some comment in the village, and a rumor found circulation to the effect that an abortion had been produced upon her. Hear-

ing of this, Mrs. Tozier called upon Dr. Barringer, the coroner, to make an investigation. He accordingly requested Drs. Townsend and Showerman to make an autopsy of the body. This was done at about 5 o'clock in the afternoon of the 6th, Drs. L. L. and Frank Tozier, with the coroner and undertaker, being present. Dr. Townsend tells us that he had a sick grandchild at home, and that the autopsy was made in a considerable hurry. An incision was made by the ribs on one side downward, around to the ribs on the other side, so as to raise the front abdominal wall. The womb was found to be a trifle larger then normal, but otherwise appeared to be healthy. It was cut open, and from the cavity came two or three drops of a tenacious white fluid, which was supposed to be muco pus, and a little more pus was found in one of the fallopian tubes. The left ovary was found enlarged, and in taking it out a cyst or small abscess broke in the hands of the operator. They also took out the heart, cutting off the blood vessels attached to it, and laid it on the bottom of a tin pan. It appeared to be a trifle smaller than normal. It had stopped in contraction, and appeared flat on the pan, as though it was weak. It having stopped in contraction, the blood was forced out. It was cut open, and the ventricles and auricles appeared to be a little thinner than normal. All the blood that they saw appeared to be red. The heart was not weighed, but, according to their judgment, it would have weighed from seven to eleven ounces. Pressure was applied to it by one of the doctors, and it broke down. The heart was returned to the body. One of the eyes was examined, and the pupil found to be largely dilated. They found that no abortion had taken place, and concluded that her death came from heart failure, superinduced by atrophy, and on the following day an affidavit was made by them to that effect. Dr. Tozier subsequently made a certificate, based upon the findings of the physicians who made the autopsy, to the effect that the cause of death was brown softening of the heart and general debility. The funeral took place on the 7th, and she was buried at Byron. After her burial the following facts were discovered: On the 14th of December the defendant went to a druggist and procured a morphine prescription to be filled, given by Dr.

Townsend the April before, when Mrs. Benham was suffering from peritonitis, and that this prescription had been filled six times by his order during her sickness, each of which contained twelve powders, making an aggregate of seventy-two doses. He purchased these powders from the druggist, representing that they were for his wife, and personally took charge of the administering of the medicines prescribed by the physician. These powders were administered to Mrs. Benham after the doctor had discovered that she was suffering from the use of morphine, and had instructed the defendant to that effect, and had requested him to procure a nurse, so that she could be watched and prevent from taking the drug. Some months previous to the last sickness of Mrs. Benham, the defendant entered Mr. Jewell's drug store, in the village of Batavia, while the clerk was reading an account in a Canadian paper of a woman who had been poisoned with prussic acid. After hearing the article read, he asked how much of the acid had been given the woman, and, when informed by the clerk that he did not know, asked how much it would take to kill a dog, and was told that a teaspoonful would do the work. He also inquired if it was easily traced by a chemical analysis after death, and was told that in the instance alluded to they had been unable to trace it. About a week before Christmas he entered the drug store, in the absence of the proprietor, and ordered of the clerk an ounce of prussic acid, saying he wanted it to kill a dog. The clerk poured out an ounce of acid into a bottle, and labeled it by writing " Prussic Acid " across a printed label containing the word " Poison." The defendant then said to him that he did not wish it to be registered, paid for it, and took it away. On the 26th of December, the day after his wife was taken sick, he called upon the same clerk for another ounce of prussic acid, and, when questioned with reference to its use and whether he had not killed the dog, stated that the story about the dog was only a joke, but that he wanted it for a stricture. Elliott, the clerk, then told him that he had never heard of its being used for that purpose, and that he could give him a preparation that would be better. After having been ordered to prepare the solution, he did so, and then was about to take the prussic acid

back, when the defendant reached over, picked up the bottle, and said that he would take that along also, in case the other solution did not prove beneficial.

After these disclosures, the district attorney ordered the body exhumed, and requested Drs. Townsend and Showerman to make a further autopsy.   This they did on the 9th of January, at the home of the mother of the deceased in Byron, to which place the body had been removed.   There was also present at this autopsy the district attorney, the coroner, Dr. L. L. Tozier, Dr. Prince, and Dr. Andrews.   They first made a general inspection of the body, and found some red spots and very pronounced rigor mortis.   The body was so stiff that lifting a foot would raise the entire body.   The wrists were flexed inward, as well as the fingers, almost to clenching.   They tried to open the mouth, but their effort proved unsuccessful.   They next examined the brain, cutting through the scalp, and, as they did so, noticed that the blood was very fluid, and of a pinkish or cherry red color, and that it flowed freely from the entire length of the incision.   In taking off the top of the skull, they found the membranes of the brain, and the brain itself, apparently healthy, though very much injected with cherry red or pinkish colored blood, and the small arteries lying over the convolutions of the brain full, but the veins empty.   On opening the skull, an odor was perceived to which they were unaccustomed, and which they were unable to describe.   Dr. Townsend, however, expressed the opinion that it was the odor of prussic acid, basing his judgment upon the odor he detected by smelling of a bottle of that acid about a month subsequent to this occurrence. The brain was quickly removed, placed in a stone jar, and sealed up with sealing wax.   Some of the fluid found in the cavity of the skull, with some of the blood, was poured into a glass jar, and taken into the next room, where it was smelled by Mrs. Farrant, who described the odor as that of crushed cherry pits, after which the jar was also sealed up.   They likewise removed the heart, spleen, a portion of the liver, a piece of the small bowels, and the stomach, which were put into cans, and sealed up.   They found in the stomach a solid body shaped like a banana, which proved to be coagulated milk, showing

that Mrs. Benham had taken milk shortly before she died, probably within half an hour. The blood was all of the color described, and no clots were found. The liver appeared to be healthy, but it was brown around the edges of the surface, while the upper border was of a pinkish color. The ankles were flexed inward, throwing the soles of the feet towards each other. The color of the blood, its freedom from clots, and the absence of blood in the heart were described as unusual, indicating that the heart had continued to bear after the lungs had ceased to act. The testimony was also to the effect that the congestion of the lungs indicated a spasm of the breathing muscles, showing that she had died while she was having a spasm of the muscles of respiration. Drs. Townsend and Showerman, after making the last autopsy, concluded that they were in error as to the cause of death reached by them on the first autopsy, and upon the trial stated that they had discovered no natural cause of death, but, taking into consideration the pathological conditions found upon the autopsies, they were now of the opinion that death was produced by poison, and that poison, according to the best of their judgment, was prussic acid. The other doctors present at the autopsy stated that they discovered no natural cause of death.

The brain and other organs removed from the body were subsequently taken to Dr. Vandenburgh, of Buffalo, and by him submitted to a chemical analysis. He testified that he discovered the presence of prussic acid in the brain, liver, and blood. Prof. Lattimore, of the Rochester University, a chemist of long standing and high reputation, was present at some of the tests made by Dr. Vandenburgh, especially that with reference to the blood, and was of the opinion that prussic acid was discovered. Drs. Morse and Parmenter, in answer to a hypothetical question embracing the facts disclosed with reference to the sickness, treatment, and death, of Mrs. Benham, and the condition in which the organs of her body were found upon the post mortem examinations, together with the fact that prussic acid was found upon the chemical analysis of the organs, state it to be their opinion that death was produced by prussic acid; and when the same question was repeated, omitting the

discovery of that poison by the chemical analysis, they were still of the opinion that death was produced by that poison.

After the decease of Mrs. Benham, the housekeeper discovered a bottle labeled "Poison," and marked "Prussic Acid," in the cupboard in the bathroom, which lacked about a tablespoonful of being full. After it had been reported that the defendant had purchased such acid at the drug store, she again looked for the bottle, but found that it had been removed. After the defendant was arrested, he sent for Dr. Tozier, who visited him at the jail. He then asked if anything had been found by the chemist, to which the doctor answered, "Probably not," that it was too soon, and he probably had not had time to make the examination. He then asked if prussic acid was not sometimes used as medicine, and was told that it was; that it was sometimes used in the treatment of irritable coughs and laryngal troubles with the throat; and that in olden times, or years ago, it was sometimas used by physicians, in a diluted state, as a wash for illconditioned sores. The defendant then asked if it was ever used as an injection, and he answered that it was not, to his knowledge. The defendant then asked if there was any way for it to get into the stomach of a person who used it as vaginal washes, and the doctor answered that he did not see how it could possibly, to which the defendant remarked that he thought it could. The doctor then replied that, unless there was acid found in the stomach, it probably would not be found at all at that period, as he understood by his reading that it was very volatile, and would escape, even though the tissues of the body. The defendant then stated to the doctor that if prussic acid was found, and he was convicted, he would never go to the chair, and he asked the doctor if he would bring him something to finish up the job. The doctor then told him to be calm and quiet, to think the matter over carefully, and make a fight for himself, and he said he would.

As bearing upon the treatment of Mrs. Benham by the defendant, and his motive, considerable evidence has been taken, to which we will only briefly allude. His treatment of her is chiefly disclosed by the servants of the household, and from their testimony it appears that he and she had frequent quarrels

with reference to money matters and to his being out nights. On one occasion he struck her on the leg or thigh, on another he threw a pillow at her violently and in anger, and on another occasion he threw a butter dish at her across the table, striking the opposite wall. The evidence tends to show that he called her vile names, and uttered expressions, in the presence of others, which were insulting, and tended to humiliate her and cause her mental distress. He called her a " damned fool," a " redheaded bitch," and a " red headed devil." Calling the attention of a man in the parlor to her, he said, " Look at that damned homely thing, with her mouth gaped wide open." On another occasion, while sitting at the dinner table, he said to her that she was so homely that she turned his stomach over, and that he would not be with her but a little longer. When they had been speaking upon money matters, and she had said something about becoming twenty-one years of age, he said to her that she would never live to see twenty-one, and on another occasion that he wished she had died before he ever saw her.

As bearing upon the question of motive, evidence has been submitted showing the injuries received by Mrs. Benham at the time of the birth of her child, and of the unfortunate condition in which she was left, owing to the rupture of the wall between the vagina and the rectum, and its resultant consequences. Other evidence was submitted tending to show that the defendant had formed a violent attachment for a young woman who lived in the village of Batavia; that he had been out riding with her frequently in the evening, had been to Buffalo with her, and had registered under an assumed name, at the Iroquois Hotel, as man and wife; that he had given her a diamond ring, and talked about going away with her, and stated to others that he loved her and that she loved him. Other evidence shows that Mrs. Benham was possessed of an estate amounting to nearly $40,000, and that she had executed a will, drawn by defendant, in which nearly all of her estate was given to him.

This is, in substance, the evidence presented by the prosecution.

Upon the defense a large number of witnesses were produced who were acquainted with the defendant and Mrs. Benham, and

who had visited them at their house, and seen them riding together on the street. They describe their relations to each other as apparently pleasant and agreeable. After the arrest of the defendant, a messenger was sent to the house, who, in the presence of Mrs. Prentice, took down a small cabinet hanging on a hook in the bathroom, had it done up in a paper, and carried it to Mrs. Benham, the mother of the defendant, who took it the next morning to the office of Mr. Watson, an attorney in Batavia. The cabinet remained in his office unopened until the trial, when it was opened by the attorney in the case, Mr. Webster, and was found to contain a six-ounce bottle filled to the shoulders with a colorless liquid, which was sealed up and delivered to the chemist Miller, who subsequently made an examination of its contents, and found it to contain a solution of nitrate of silver and water. It also appeared from the testimony of the mother of the defendant that Mrs. Benham, after her sickness in April, 1896, and after her apparent recovery, was in poor health, having a great many sick days or mornings; that she was languid, and frequently suffered with a pain across the abdomen; that she was poorly, and at times remarkably pale, complaining of indigestion, and had a bad breath; at times took morphine and phenacetine powders, which had been prescribed for her during her April sickness; and that, on two occasions, she had been found apparently under the influence of morphine. Some evidence was also given tending to contradict the testimony of Dr. Townsend, with reference to some statements made by him in an article published in one of the papers, giving the cause of death as ascertained by him upon the post mortem examination.

A number of physicians were called, who described the manner in which autopsies should be conducted, and whose testimony was to the effect that the autopsies in this case were conducted in such a manner that the cause of death could not be determined therefrom; that, assuming the facts to be as stated with reference to the injuries she received at the birth of her child and the conditions existing thereafter, it would result in the impairment of her general health; that her sickness in April, 1896, in their opinion, was due to the pelvic injuries received

during childbirth, and to septic poisoning occasioned by the· formation of the pus in the uterus and fallopian tubes; that her poor health, as described by the defendant's mother, after her apparent recovery from the April sickness, indicated a progressive impairment of her health, which would more or less· affect the organs of the body, especially the heart; that her· sickness commencing on Christmas night was correctly diagnosed by the attending physician as a bilious attack, but was doubtless induced by her chronic pelvic disorder; that the attack on the evening of December 31st could properly be accounted for by some cardiac pain or neuralgia, followed by a partial failure of the heart; and that the symptoms did not necessarily show the administration of prussic acid. They also testified that, from the evidence disclosed as to the second attack, on the morning of January 4th, on which she died, it could not be positively stated to be due to prussic-acid poisoning; that, taking into consideration the history of the case, the diseased ovary, the discovery of pus in the uterus and fallopian tube, her impaired health, and the weak condition in which her heart was found, they were of the opinion that she did not die from the effect of prussic-acid poisoning, but from some natural cause.

The defendant also made a vigorous attacked upon the chemical analysis made by Prof. Vandenburgh, in which it is claimed that his tests were improperly conducted; that they were not carried to completion; and that it could not be properly determined, from the tests made, that prussic acid was present in the portions of the viscera analyzed by him. Prof. Vandenburgh testified that his first test was made with a portion of the stomach, and that no prussic acid was found. His next experiment was with a portion of the brain, which was cut up, and put into a glass flask with a solution of pure tartaric acid, using the apparatus prescribed by Witthaus & Becker in their Medical Jurisprudence and Toxicology. The contents of the flask were heated over a bath of parafine, starting at about 25 degrees centigrade, and then gradually increasing the temperature, until 90 was reached. In this manner they obtained a precipitate, upon the nitrate of silver in the " U " tube, at the

further end of the apparatus, of a dark color, and another pre-cipitate of a light gray color, but in a small quantity. This precipitate was transferred from the tube in which it was col-lected, washed out upon a filter, and dissolved with ammonium hydrate. This dissolved the lighter precipitate, and then he acidulated it with dilute hydrochloric acid in a small flask, corked it tightly, and shook it thoroughly for some time, and then let it stand and settle. After this had been done, he filtered off the precipitate, and had remaining chloride of silver and a colorless limpid liquid as a filtrate. He then submitted differ-ent portions of this filtrate to tests,—one portion to that which is known as the "Prussian blue test," another portion to the thiocyanate, another portion to the guaiac, and the last to the nitroprusside test, each of which showed the presence of hydro-cyanic acid. The blood and liver were submitted to similar tests, each disclosing the presence of the acid. At another test made of the blood, in the presence of Prof. Lattimore, a slit of glass upon which was placed a solution of silver nitrate was exposed over a jar containing the blood, which resulted in the forming of crystals upon the silver nitrate. Prof. Lattimore tells us that "these crystals are of a very characteristic form, and, by comparison with well-known cases, the eye becomes quite familiar with them, so as to recognize them with very considerable certainty." He further says that he saw the for-mation of the deposit upon the glass and examined it under the microscope, and that the crystals had the appearance of hydrocya-noic acid, and that it was his opinion that the deposit on the glass was cyanide of silver containing prussic acid. Prof. Van-denburgh further testified that before making the analysis, he made a preliminary test, for the purpose of determining the presence in the viscera of ferrocyanids, the ferricyanids, and thiocyanates, and describes the manner in which these ex-aminations were conducted. Finding no evidence of their presence, he proceeded with the analysis described. We are told by Prof. Witthaus that hydrocyanic acid is not present in the normal human body, living or dead and that it is not a product of decomposition or putrefaction, but that double cyanids and thiocyanates may be in the body, and, upon being

decomposed, may yield hydrocyanic acid on a distillation with a mineral acid, and it was therefore necessary to make a preliminary examination of a portion of the material for the purpose of determining their presence.

The first and most important question brought up for our review is whether the corpus delicti has been established. Section 181 of the Penal Code provides that " no person can be convicted of murder or manslaughter, unless the death of the person alleged to have been killed and the fact of killing by the defendant as alleged are each established, as independent facts, the former by direct proof and the latter beyond a reasonable doubt." This provision of our statute is but a statement of the rule which prevailed at common law. The corpus delicti, in case of murder or manslaughter, means the body of a crime, and is divided into two component parts; the first of which is the death of the person, and the second is that the death is produced through criminal agency. The first must be established by direct evidence, and the latter by direct or circumstantial evidence, to the satisfaction of the jury, beyond a reasonable doubt. Ruloff v. People, 18 N. Y. 178; People v. Beckwith, 108 N. Y. 67, 15 N. E. 53; People v. Bennett, 49 N. Y. 137; People v. Palmer, 109 N. Y. 110, 16 N. E. 529; People v. Place, 157 N. Y. 584, 602, 52 N. E. 576. In this case the death of Mrs. Benham was established by direct evidence of witnesses who were present at the time, and is a conceded and undisputed fact of the case. The controverted question is whether her death was produced by a criminal act of the defendant. The charge is, as we have seen, that her death was produced by the administration by him of (a dose of) hydrocyanic acid, commonly known as " prussic acid," with the deliberate and premeditated design to effect her death. If the poison was administered by him under the circumstances claimed by the prosecution, there can be no doubt but that the evidence would justify the jury in finding the necessary deliberation and premeditation to constitute the crime. So that the real question in the case is as to whether the poison was administered by him, and whether it caused her death.

In discussing the evidence bearing upon this question, we

regret that the autopsy was not as carefully or fully performed as it should have been.    There were several organs of the body which were but partially or imperfectly examined, and consequently, the testimony of those performing it is not as satisfactory as it would have been had these organs been thoroughly examined, thus excluding any possibility of death from natural causes.    It is true that the last autopsy took place under unfavorable conditions.    A prior autopsy had been made for the special purpose of determining whether an abortion had been produced.    The attention of the operating physicians was drawn especially to that inquiry, and no suspicion of poison then existed.    They examined the parts necessary to determine that question, and then, at the suggestion of one of the physicians, concluded to look at the heart.    This they did by removing it from the body in a different manner than should have been done had they been making an investigation for the purpose of determining the presence of prussic acid.    During the first investigation the stomach was punctured so as to allow an escape of some of its contents, and this interferred, to some extent, with the investigation subsequently made.    There were, however, some facts discovered upon the last post mortem examination, notably bloated face; well pronounced rigor mortis; ankles flexed inward; soles of the feet turned towards each other; wrists and fingers firmly flexed inward; pupils of the eyes largely dilated; lower jaw firmly set against the upper jaw to such an extent that the examiners were unable to separate them; fluid blood free from clots, and of a cherry-red color; a striking odor upon the removal of the skull, likened to the odor of prussic acid; spots upon the body of a brighter and redder color than usual; lungs filled with blood and air; heart found in contraction; liver pinkish on the upper border, and a little brown on the edges and under the surface,—all of which facts, taken together, satisfied the examiners that the person died from the effects of prussic acid poisoning.

It is urged on behalf of the defendant that the facts alluded to as discovered upon the autopsy were not sufficient to authorize such a conclusion of the examiners; that taking into consideration the pelvic trouble with which the decedent had

been afflicted, the presence of a cyst upon one of the ovaries, and of pus in the uterus and fallopian tube, together with the weakened condition in which the heart was found, the cause of death might be attributed to natural causes. It was also claimed that, in view of the lapse of time between the death and the last autopsy, the blood would have been of a dark venous color if hydrocyanic acid had been administered, rather than the cherry red found.

With reference to the color of the blood, the testimony of the expert witnesses is not in entire harmony. Prof. Witthaus, in his late work on Medical Jurisprudence and Toxicology, says: "In cases of prussic acid poisoning, the veins are distended with dark fluid blood, but the blood, while fluid, is bright red in color." Upon the witness stand he gave it as his view that, in case of a heavy dose and a quick death, the blood would be bright red, but after a time it would turn dark; while, in cases where the amount of the poison administered was light and the death was slow, the blood would be dark. While recognizing the force of the defendant's criticism with reference to this portion of the case, and conceding that the facts disclosed by the post mortem examination, standing alone, would not be sufficient to satisfy us as to the cause of death, it must be conceded that nearly all of the conditions found which we have enumerated are such as attend a death produced by hydrocyanic acid, and that it becomes our duty to consider this evidence in connection with the other evidence presented in the case.

We have already called attention to the evidence with reference to the chemical analysis that was made of the brain, liver, and blood of the deceased, as given in the testimony of Profs. Vandenburgh and Lattimore. It is contended that thiocyanates may have existed in the body of Mrs. Benham, which, upon analysis, would decompose, yielding hydrocyanic acid, and that the preliminary test made was not sufficient to exclude their presence, owing to the fact that mercuric chloride existed in the embalming fluid used by the undertaker. We are told that thiocyanates are often found in the saliva, urine, and milk, and, under certain conditions, may be found in the blood, but never in more than infinitesimal quantities. In this case there was no

chemical analysis made of the saliva, urine, or milk. The tests in which hydrocyanic acid is claimed to have been discovered were limited to the brain, liver, and blood, and, under the circumstances, we think it became a question for the jury to determine the amount of confidence that should be given to the tests.

Another criticism is made upon the nitroprusside test, in which Prof. Vandenburgh stated that he used potassium nitrate, and that this was wrong. He, however, subsequently testified that if he had used the term "potassium nitrate," it was an error; that he in fact used potassium nitrite, and produced in court the formula on which he had relied at the time of making the test, which specified nitrite instead of nitrate. An interesting question of fact was thus presented for the determination of the jury. If he used nitrate, so far as this test is concerned, it would be valueless; but if he used nitrite, and obtained the reaction testified to by him, it then had an important bearing upon the case. It appears to be conceded that potassium nitrate would not have produced the colors sworn to. He must, therefore, have used the potassium nitrite, or else he has deceived us with reference to the colors obtained.

It is true that other tests might have been applied to the filtrate in addition to the four tests that were made. In the silver test the crystals might have been measured, and then dissolved, and their character determined, possibly, with greater certainty. But the tests made by him were those recognized and recommended as being the surest and most delicate for the purpose of determining the presence of hydrocyanic acid, and which are chiefly relied upon by chemists. Other criticisms are made with reference to the other tests to which the filtrate was subjected. We cannot, however, within the reasonable limits of an opinion, describe and discuss other than the principal points made in this voluminous case.

While chemistry is a science, and facts may be established thereunder, there are but few things dependent upon the action of human agency that may be made absolutely certain. It may be that it cannot be said that the results reached by Prof. Vandenburgh are absolutely sure and correct, and that there is no pos-

sibility that there is a mistake; but if he has spoken truly, and his testimony is to be believed, we think the result reached by him is entitled to some weight, and became a proper consideration for the jury.

The evidence bearing upon the death of Mrs. Benham is without substantial dispute, and we cannot regard it otherwise than as very damaging to the defendant's case. His conduct in purchasing morphine, and administering it to his wife, after the doctor had found that she was suffering from its effects, and had advised him that she must not have it, and in falsely pretending that she had procured it herself, remains unexplained. His request for the coachman to remain in on the evening of December 31st, the night of her first attack, under the circumstances, is open to the suspicion that he expected the death of his wife to occur that night. His conduct in refusing to allow the decedent's mother to take care of her the last night of her sickness, and his remaining up, fully dressed, is difficult to explain upon the theory of innocence. As we have already seen, the defendant had not only bought morphine for his wife, but he had also procured, and had in his possession, hydrocyanic acid, one of the most dangerous poisons known in the science of toxicology. His excuse for the purchase of this poison is far from satisfactory, and no evidence has been offered showing that a drop of the acid was ever used for the purpose specified by him. Of course, no eye saw him administer it to his wife. If he administered it at all, it is quite apparent that he did so upon two occasions. The first on the night of the 31st of December, and the last on the morning of the 4th of January. We are told that, in cases where small doses are taken, vomiting is uncommon, but, if it does occur, it is usually the beginning of recovery. One of the first things that Mrs. Benham said to the defendant, after she had vomited and partially recovered, was, "Too strong, too strong. I told you it was too strong." This expression on her part can have, under the circumstances, but one significance, and that is that he had given her something which produced the attack. Again, during the last night, and within five minutes of the time that the mother was called, they were heard talking in the room, Mrs. Benham protesting

that she did not want to take that, saying, "I don't see what you want me to take that for;" and then, after remarks from him, came the final, "I don't care; I think you are just as mean as you can be." This conversation can mean but one thing, and that is that he was offering her something to take to which she objected, and then, upon his persistence, yielded, with the expression alluded to. It is therefore evident that something was given to her, and what was the result? Within five minutes she was in a dying condition, and within fifteen or twenty thereafter she was dead.

Hydrocyanic acid is described as a volatile poison, and a very small quantity will produce death. When first taken, it causes a sense of constriction of the chest, suffocation, irritation of the throat, dizziness, impeded locomotion, and heaviness of the head. In some instances, the person, upon taking the poison, cries out or shrieks. None of the professional witnesses speaking upon this subject had had an opportunity to witness the effect of prussic acid upon the human system from the time of the taking of the poison until death, with the exception of Dr. Pugsley. On one occasion he had witnessed a case of the kind at the Erie county almshouse. The man picked up a vial containing half an ounce of prussic acid, and swallowed it. With a scream he fell to the ground, and in a minute clutched at his throat as if he were strangling. He gasped, and within a few minutes was seized with convulsions, with frothing at the mouth, and eyes staring as if in fright. In the beginning his inspirations were longer than his expirations. The spasmodic condition gradually lessened, and between ten or fifteen minutes ceased entirely, death ensuing. The autopsy was had about thirty hours after death. The rigor mortis was very marked, and the mouth firmly closed, so that with all the effort they could make with one hand on the chin and the other on the forehead they could not open it. The hands were flexed upon the wrists, and the fingers upon the hands. The pupils of the eyes were dilated, and the feet were turned inward towards each other. The lungs were engorged and inflated. The blood was in a semi-fluid condition, of a cherry-pink color; the heart was small and soft; the stomach was in a reddish.

condition, rather indicative of inflammation; kidneys and liver were in a healthy condition, but there were red spots on the surface of the liver; the bladder was empty.

When taken in small quantities, the symptoms, as given by Prof. Witthaus, are: "The face is pale and bloated; the finger nails are blue or purple; the eyes prominent and glassy, are directed upward, or have a rolling motion; and the mouth is marked with froth. The patient is seized with convulsions of a tetanic character, with the jaws and hands firmly clenched. The pulse is quick, the respiration slow and stertorous, and mucous rails are heard over the chest. Vomiting is uncommon; but, if it occur, it is usually the beginning of recovery. The vomited matters, as well as the breath, have an odor of bitter almonds. If the case terminate in death, there are usually strong tetanic convulsions, involuntary evacuations of the urine and fæces, and opisthotonos. Then succeeds a condition of general paralysis, and death from asphyxia follows. When recovery occurs, it does so gradually, the respiration returning slowly to the normal condition within a few hours, and without further complication. In large doses, subjective symptoms may be entirely absent. In less than a minute consciousness is suddenly lost, and the patient suddenly falls to the ground, if sitting or standing. Then there is usually a short convulsive seizure, during which evacuations of urine and fæces frequently occur. After this the patient lies perfectly still, with prominent, glassy eyes, jaws firmly clenched, mouth covered with foam, face at first bloated, afterwards pale and sunken, pupils dilated and insensible, surface cold and clammy, and muscles completely relaxed. The pulse, at first somewhat more frequent than normal, rapidly becomes weaker, until in the latter stage it is imperceptible. The respiration is spasmodic, the inspirations are short, and immediately followed by protracted and very deep expirations, after which succeeds a pause of considerable duration, increasing as the case progresses to a fatal termination."

Taking into consideration all of the facts in this case, in connection with the procuring of the poison by the defendant, and the symptoms as disclosed by the evidence, comparing them with the symptoms recognized by the authorities, together with

the facts disclosed by the autopsies and the analysis, it appears to us that the evidence warranted a submission to the jury of the question whether the death of Mrs. Benham was produced by the defendant's administering hydrocyanic acid to her, and that the determination of that body upon that question of fact must be regarded as final.

The people's counsel, in his opening address to the jury, stated : "It is not my purpose, nor would it be quite proper, to anticipate in detail the testimony of the witnesses who will be called here. It might be that I would misquote their testimony. It might be that I would give a forced construction to the statements which they will hereafter make upon the witness stand, and if there is any one thing which the prosecution desires in this case it is to be perfectly fair, and to give to this jury only as clear and exact a statement of the testimony as it is possible to give. So far as the opening of this case is concerned, we will only give you a bare outline of the facts upon which the prosecution relies to bring conviction to your minds." He then proceeded to give a history of the defendant and of the deceased, and of the evidence that he expected to produce before the jury; but, in stating the evidence, in some instances he made use of the expression, "We will show you," etc., without stating his expectation of producing evidence that would show what he claimed to be the facts of the case. He then summed up his claims as follows : "In brief, the prosecution in this case will show you, first, that this man had lost all love and respect for his wife; that he desired to be rid of her; that he had formed other alliances, which were more satisfactory and agreeable to him; that, while he desired to be rid of her, he desired to obtain her money, and had thoughtfully provided by a will, which he drew himself two days prior to the birth of his boy,— he had thoughtfully provided in that will for his own future, because under it he would pass into an inheritance of somewhere in the neighborhood of $30,000. While he desired to be rid of her, he wanted the conditions such that her money would come to him. This was the motive. We will show you that the symptoms preceding death,—that the post mortem appearances after death indicated prussic-acid poisoning as the

cause of death. We will show you that a chemical analysis of a portion of the remains of Mrs. Benham indicated the presence of prussic acid. We will show you its purchase under the peculiar circumstances outlined to you. We will show you all the circumstances surrounding her illness, and just preceding the two serious illnesses of which I have spoken. We will show you by physicians that, taking into account all the conditions, there was no other cause of death than by prussic acid." He then concludes his remarks by saying : " Such, in brief, is the people's case. We expect to establish it by legal evidence,— competent evidence. We expect to establish it beyond a reasonable doubt, as the law requires us. "

There was no complaint made by the defendant at the time of the delivery of the opening address with reference to the expressions made use of by counsel, and consequently no exception is presented upon which the charge of error can be founded. But it is now urged that some of the statements made were prejudicial to the defendant, and that the court, in the exercise of its discretion, should award a new trial. We do not, however, think that the claim of the defendant is well founded. It is the right and duty of the counsel representing the people, upon the commencement of a criminal trial, to make a statement to the jury of the evidence that he expects to present, and the claim that he will make with reference thereto, to the end that the jury, upon listening to the evidence, may better understand and appreciate its connection and bearing upon the case. It is true that, in making a statement of the evidence, the counsel in some instances stated what the evidence would show ; but we think the jury was not misled, for, in his opening remarks, he called the attention of the jury to the fact that it would not be proper to anticipate in detail the testimony of witnesses, and that he might misquote or give a forced construction to it, thus indicating that he was proceeding to state his understanding of what the evidence would be.

Complaint is also made with reference to the summing up of the district attorney. During his remarks the defendant was referred to as a seducer. To this expression the defendant's counsel interposed an objection upon the ground that there was

no evidence justifying such a charge. The district attorney then stated that, so far as the evidence in this case shows, he believed him to be the seducer of the woman called May. A discussion then took place as to the evidence upon that subject between the district attorney and the defendant's counsel, the court interposing with the remark that the evidence hardly justified the charge that he seduced her, but stated that their relations were matters for argument. The district attorney then stated that it was not his purpose to misstate the facts, and, if he done so, he had done it unwittingly; that he did not wish to go further than the evidence warranted, and, if he had done so, he asked the jury to forget that, and remember only the facts. He then stated the evidence with reference to the relation between the defendant and the woman May, and to that statement there was no objection. We do not deem it necessary to enter upon a discussion of the question as to whether the defendant was a seducer. That remark was, in effect, withdrawn by the district attorney, and the true facts of the case stated so that the jury was left to determine from the facts whether the claim of the district attorney was well or ill founded. The right of the district attorney in discussing questions before a jury has been the subject of recent consideration by this court, and so much has been written that we do not deem it necessary to again, at this time, enter upon a discussion of the subject. People v. Fielding, 158 N. Y. 542, 53 N. E. 497; Williams v. Railroad Co., 126 N. Y. 96, 102, 26 N. E. 1048. It is sufficient for the purpose of this case to say that, if the district attorney exceeded the bounds by characterizing the defendant as a seducer, he sufficiently retracted the statement by asking the jury to disregard and forget what he had said, and to only consider the evidence upon the subject.

Upon the trial Arthur E. Clark was sworn as a witness for the people, and testified that he was the attorney of the Lawyers' Surety Company of New York. He was then asked the question as to whether he had knowledge as to the estate of Mrs. Benham that came to the hands of Martin C. Benham as her guardian. This was objected to by the defendant's counsel as leading up to prove motive in the case, and that evidence of motive was

not competent until the *corpus delicti* had first been shown and evidence presented connecting the accused with the homicide. The court overruled the objection, and an exception was taken by the defendant. It appears that the district attorney had opened the case by proving the death of Mrs. Benham by persons who were acquainted with her and saw her after her decease. He then proceeded to show her relations with the defendant, their marriage, the making of her will, and the history of the parties up to the time of her decease, which included much of the evidence bearing upon the question of motive, before introducing his expert evidence showing that death was produced by criminal means. As we have seen, the death of Mrs. Benham was first shown by direct testimony. The district attorney was then required to show whether the death had been produced by criminal means, and,. if so, by whom. It was competent to establish these questions by circumstantial, as well as by direct, evidence. People v. Bennett, 49 N. Y. 137, 143. Under our practice the district attorney should present the evidence upon these questions in the order in which they have been mentioned, but, whatever the rule may be in other states, we think there is none in this which prohibits the court from permitting a departure from that order of proof. Section 388 of the Code of Criminal Procedure provides that : " The jury having been impaneled and sworn, the trial must proceed in the following order: (1) The district attorney or other counsel for the people must open the case, and offer the evidence in support of the indictment. (2) The defendant or his counsel may then open his defense and offer his evidence in support thereof. (3) The parties may then, respectively, offer rebutting testimony, but the court, for good reason, in furtherance of justice, may permit them to offer evidence upon their original case. (4) When the evidence is concluded, unless the case is submitted to the jury on either side or on both sides without argument, the defendant or his counsel must commence, and the counsel for the people conclude the argument to the jury. (5) The court must then charge the jury." It will thus be seen that the Code clearly points out the order in which the trial must proceed, and that it expressly gives to the court the power,

in its discretion, in furtherance of justice, to permit evidence to be received out of its order, and upon the original case, even after a party has rested, if it is before the case is finally submitted. The provisions of this statute have recently received attention by this court in the case of People v. Koerner, 154 N. Y. 355, 368, 48 N. E. 730, 734, in which case, after fully considering and construing the provisions of the Code, the conclusion was reached, as stated in the opinion, that, "while it may be prop- erly said that if the testimony of those witnesses was known and understood by the district attorney when he rested he should have called them as witnesses before that time, yet it was discretionary with the court to permit their testimony after- wards." We think, therefore, that the exception was not well taken.

Evidence was submitted on behalf of the people by four wit- nesses tending to show that, on the evening of the 29th day of November, prior to the alleged homicide, the defendant, in com- pany with one Andrews, met a woman upon the street in the village of Batavia, whom the defendant called Millie. He en- gaged a livery, taking Andrews for driver, and the three started at about eleven o'clock at night for the village of Akron, eigh- teen miles distant, at which place they arrived a little after four o'clock in the morning. They went to the American Hotel and took rooms, the woman and the defendant occupying the same room. They remained at this hotel until the after- noon of that day, when they were requested to leave by the proprietor. They did so, and then went to another hotel in the same village, and remained there until the next day, and then returned to Batavia in the evening. Andrews, Wells, and Bit- terman were first sworn with reference to this transaction, and no objection appears to have been taken to their evidence; but subsequently objection was taken to the testimony of Wells, the son of the proprietor of the American Hotel, identifying the register, where the defendant wrote, "H. C. Benham and wife, Batavia." It is now claimed that the transaction had no bearing upon the issues of the case, and that the evidence only tended to degrade the defendant and prejudice him in the eyes of the jury; that the evidence does not show that he had ever

met the woman before or since; that it was the case of a prostitute picked up upon the street; and that it did not tend to show any loss of affection for his wife or desire to be rid of her. We recognize the fact that evidence of this character may tend to degrade the person accused in the minds of the jurors, and that evidence which is taken merely to show previous bad or vicious character is inadmissible; but if it tends to prove or establish any fact at issue upon the trial it is competent, even though it tends to degrade the party. We must bear in mind that the defendant is charged with the murder of his wife. In determining the question whether he is guilty, motive becomes an important consideration. It is charged that he had lost all love and respect for his wife; that he had formed other alliances that were more satisfactory and agreeable to him; and that he desired to get rid of her.

Much has already been written upon this subject, but we do not now deem it necessary to enter upon an elaborate consideration of the authorities. The question, to some extent, has been recently considered by us in the cases of People v. Harris, 136 N. Y. 423, 33 N. E. 65; People v. Strait, 148 N. Y. 566, 42 N. E. 1045; and People v. Scott, 153 N. Y. 40, 46 N. E. 1028. It may be that a man may privately consort with such a woman without the loss of affection for his wife, but in this case it will be remembered the transaction commenced in a village where the defendant and his wife resided and were well acquainted, and was continued at a hotel where they both were well known, openly and notoriously, and under such circumstances that it could hardly fail to come to the attention of his wife and neighbors, thus exposing his conduct and infidelity. We are inclined to the view that the jury might have fairly and reasonably inferred from the transaction that the relations between the defendant and his wife were not agreeable, and that there was, upon his part, a lack of affection and respect for her, and that the evidence consequently was admissible.

One Frank Coward was sworn as a witness for the people, and testified that he was in business on the Elk street market, in the city of Buffalo; that in October, 1896, the defendant came to his place of business in a carriage, and wanted to bor-

row some money; that on his leaving witness followed him out, and saw in the carriage a woman about twenty-five years of age, who was not Mrs. Benham. The witness was unable to give the date of the month, but testified that it was in October. His evidence was taken under objection, and after its conclusion a motion was made to strike it out. Upon representation of the district attorney that it would be connected with other evidence tending to identify the person, the motion was denied; and then followed the testimony of other witnesses, which tended to show that on the 14th day of October the defendant was in Buffalo with the woman called May; that he registered at the Iroquois Hotel as man and wife, under an assumed name; and that he stated to an acquaintance that the young lady was a daughter of a leading manufacturer in Batavia. Other evidence was given tending to show that he procured a team and went out riding with her in the afternoon, and that he made inquiries as to a good jewelry store in Buffalo, and asked an acquaintance to go with him and help him purchase some jewelry. After the giving of this evidence, another motion was made to strike out the testimony of Coward, which was denied, and an exception was taken. It is true that Coward was unable to fix the date as that of the 14th of October, the time fixed by the other witnesses. It therefore is possible that some other woman accompanied him in the carriage to Coward's place of business at the market, but it appears from the evidence that, in a conversation with his acquaintance on the morning of the 14th of October, he stated that he had been down to the market to see the boys. We think it therefore became a question for the jury to determine whether the transaction alluded to by Coward occurred on the same day referred to by the other witnesses, and whether the woman in the carriage was the same as the one registered at the hotel as his wife. In this connection, we think that the testimony of the witness Kaiser, to the effect that he saw the defendant with a young woman, at the Hotel Iroquois, enter a carriage and drive away, was not objectionable, in view of the fact that the defendant had represented her as being not his wife, although registered as such.

Complaint is made with reference to the admission of the

testimony of Mrs. Chadwick and other servants, who testified to quarrels between the defendant and his wife two years before her death. It may be that a single transaction of the character related, occurring two years before, standing alone, would be too remote to have any force as evidence; but taking these quarrels in connection with the whole history of the case, the treatment of the deceased by the defendant, continuing down to the time of her death, we think it cannot be said that the evidence was improperly received. Among the circumstances from which malice in the killing by the husband of his wife may be inferred is that of long-continued ill treatment. Whart. Hom. (2d Ed.) § 723.

Drs. Andrews, Pierce and Showerman were present and took part in the last autopsy held upon the body of the deceased. After describing the discoveries made with reference to the brain and other organs of the body, they were permitted to testify that they did not see any evidences of disease other than the conditions described by them, and that they did not discover any natural cause of death. An exception was taken by the defendant to this evidence, and it is now contended that it was improperly received. We think the evidence was competent. There was nothing in the ruling that indicated the amount of reliance or the force that should be given to it by the jurors. That was left for their determination. The weight that should be given to the evidence depended largely upon the care with which the brain and various organs of the body had been examined. The autopsy was for the purpose of determining the cause of death, whether it resulted from natural causes or from a criminal act. If the examination of the various organs was superficial, the testimony of these doctors would be entitled to but little weight; but, if the examination of the organs was made with care, they ought to have been able to determine whether death was the result of natural causes. They frankly stated to the jurors the extent of their examinations and what they saw, and that they discovered no natural cause of death.

It was also contended that Dr. Showerman was not a toxicologist, and that it did not appear that he had studied or had

experience in cases of poisoning sufficient to qualify him as an expert to testify in regard to the effect of prussic acid upon the human system.   He was permitted to testify that there were pathological conditions found in the body of Mrs. Benham which, to the best of his belief, indicated the effect of prussic acid.    Dr. Showerman was a graduate of the University Medical College of New York; was admitted to practice in March, 1886; and since that time had been practicing his profession at Batavia.    Toxicology treats of poisons and their antidotes, and, although regarded as a separate branch of medicine, is so closely and intimately connected with the treatment of disease that physicians, of necessity, should know and understand the effects, at least, of ordinary poisons upon the human system. The doctor, in his testimony, did not attempt to express an opinion on other basis than the pathological condition that he observed, and before reaching his conclusion he tells us that he had read the authorities upon the subject of the effect of prussic acid, including Wood, Foster, American Reference Handbook, Barthalow, United States Dispensatory, Taylor and Whitthaus.    We think this testimony was competent, as well as that of Drs. Townsend, Morris and Parmenter, who were permitted to express opinions upon the same subject.    People v. Rice, 150 N. Y. 400, 54 N. E. 48.

Upon the cross-examination of Dr. Barringer, the coroner, by the defendant's counsel, it appeared that at the inquest he excluded from the room Mr. Watson and his stenographer, who appeared to represent the interest of the defendant.    The coroner had stated that this was the first inquest he had ever held ; that he was very green and knew nothing about the law, but had understood from what he had read and been told that his court was a private or secret court.    The defendant's counsel then asked him if he understood from his reading that he had the authority to hold a "star-chamber proceeding," and the witness answered to the effect that he did, if counsel wished to use that expression.    Thereupon the district attorney asked him to give the names of the persons who were present, including the names of the jurors.    This was objected to, and the district attorney claimed that the evidence was competent for

the purpose of showing that it was not a "star-chamber proceeding." The witness was permitted to answer, and gave the names of the nine jurors who sat upon the inquest. We think the court might properly have excluded the evidence. The proceedings before the coroner were not up for review in the trial of this case, and it mattered not who were or who were not present upon that investigation. We cannot, however, see that any harm was done to the defendant. The verdict of the coroner's jury was not received in evidence, and therefore we are not advised as to whether the gentlemen composing the jury on that occasion were or were not of the opinion that a crime had been committed. The fact merely appears that there was a coroner's inquest at which the gentlemen named as jurors were present, and that is all.

Numerous other exceptions were taken to the admission and rejection of testimony, which we do not deem it necessary to here discuss. We have already referred to those orally argued, and have carefully examined those to which the brief has referred. We find none which we think can properly be made the foundation of error for which a new trial should be granted.

Complaint has been made by the defendant's counsel with reference to the charge delivered by the court. It is asserted that in summarizing the evidence relating to the question of motive, and also the evidence given by the people, the court unfairly emphasized the people's case, and minimized the evidence given on the part of the defendant. We have carefully read the charge for the purpose of determining whether the defendant has been treated unfairly. The judge reviews the law and the evidence at great length, and while it is quite possible that more time was taken in commenting upon the people's evidence than that of the defendant, it must be borne in mind that the people's evidence was much more voluminous, and, consequently, of necessity required more time in which to refer to it. The defendant's counsel points us to no expression falling from the lips of the judge that he claims to be detrimental or unfair to him, and in our reading of the charge we have found none. In every instance in which the defendant's counsel called the attention of the judge to any item of evidence or theory of

the case maintained by the defendant, the judge, in each instance, called it to the attention of the jury, with appropriate remarks.   At the conclusion of the charge, the defendant's counsel took an exception to the court's instruction to the jury as to the provision of the Code with reference to murder and manslaughter in the second degrees.   We do not understand him to urge a review here of those exceptions.   He does, however, insist that the court erred in refusing to charge certain requests that were made at the conclusion of the charge.   There were some requests then made which we think were proper. They were refused, and exceptions were taken.   The court then adjourned for dinner, after which it convened, and the jurors were again called before they had entered upon their deliberation, given further instructions, and then charged two of the requests which the court had previously refused, which, in substance and effect, covered all of the requests that had been refused.   We cannot assent to the contention of counsel that the court, once having charged a proposition of law, cannot retract it, and correct the charge made before the jury has determined any of the issues of the case.   Such a rule would put it beyond the power of the court to correct an error made upon the trial, even though it was discovered before the jurors had entered upon their deliberation.   Such a requirement is not sanctioned by any principle of public policy, nor by a necessity to protect any of the rights which are guarantied to the accused.   It would only result in requiring the case to be retired, thus imposing an uncalled-for burden both upon the public and the accused. Greenfield v. People, 85 N. Y. 75, 90.

Before submitting the case to the jury, defendant's counsel handed to the court a number of written requests to charge. The court, at the conclusion of its charge, specifically charged three of these requests, and then declined to charge the rest differently than that embodied in the charge, and gave the defendant an exception.   Some of these requests required facts to be established by evidence equivalent to "absolute and positive proof."   Other requests were to the effect that if there be "any doubt," whether it amounted to a reasonable doubt or not, the jury should acquit.   Others were merely argumentative, calling

upon the judge to instruct the jurors that such circumstances were entitled to great weight in their minds. These requests were uncalled for, and the court properly refused to charge them. Poole v. People, 80 N. Y. 646; People v Owens, 148 N. Y. 651, 43 N. E. 71.

Among the written requests which the court declined to charge differently from that embodied in its charge are several which perhaps should be separately considered. One is as follows: "If it be true that the chemical tests of Dr. Vandenburgh are valueless for the determination of the finding of prussic acid in the body of Florence T. Benham, or his truthfulness be doubted, then no inference can be drawn from his testimony, and proof of death by prussic acid is wanting, and the defendant should be acquitted." We think it must be conceded that a correct proposition of law was presented by the first part of this request, and, had the learned counsel for the defendant concluded with asking for a direction that no inference can be drawn from his testimony, it doubtless should have been charged; but the court was further asked to instruct the jury that " proof of death by prussic acid is wanting, and the defendant should be acquitted." This part of the request entirely ignores the testimony of Dr. Lattimore, who was present, assisted in and witnessed one of the tests made by Dr. Vandenburgh of the chemical analysis of the blood in which the presence of prussic acid was discovered. This part of the request also required the court to take from the consideration of the jury the testimony of the physicians who took part in the post mortem examination, and of all of the facts discovered by them. For these reasons we think the request was properly refused.

The defendant further requested : " That if it be true that the opinion of Dr. Townsend and others is based upon a group of pathological symptoms evidencing to them death by prussic-acid poisoning ; and it be found as a fact by the jury that the clenched hands, which was one of the symptoms, was so made by the embalmer, and the clenched jaw, which was another, was so closed by Dr. Tozier, and its firm closing was due to rigor mortis, as in ordinary cases; and that the pink blood, which was another determining factor, is not a characteristic of prussic-

acid poisoning in slow death, and its color due to the embalming fluid or other disease; and the flexed feet were due to natural causes; and the recognition of the odor of the brain is doubtful; and it is found that the condition of the heart being empty is not a characteristic of prussic-acid poisoning,—then disruption of this group, which is the foundation of this opinion, by the disproof of one or more of these symptoms or factors, renders the opinion of these physicians, as to the true cause of death being by prussic acid, valueless, and no safe inference as to guilt can be based upon such testimony." It will be observed that this request instructs the jury that the testimony of these physicians must be considered valueless and disregarded, if one of the symptoms enumerated should be disproved. We think there is no authority for this. The disproof of one symptom may, to some extent, weaken the conclusion of these witnesses, but may not totally destroy it, so that their testimony should be wholly disregarded by the jury. Suppose there be doubt as to the nature of the odor discovered on opening the brain ; if it was the odor of prussic acid it would furnish a strong circumstance, and have much influence in convincing the mind of the presence of that acid; but, owing to the fact that persons may be easily deceived with reference to odors, the physicians may have placed but little, if any, reliance upon it, and based their judgment upon the other facts discovered.

The last request which we deem it necessary to separately consider is as follows: " That if the post mortem held upon the body of Florence T. Benham furnish no proof, or doubtful proof, of prussic-acid poisoning and death therefrom, and the chemical tests of Dr. Vandenburgh are inconclusive or doubtful, or that he has been mistaken in not determining that the alleged evidence of hydrocyanic acid were due or not due to his own faulty processes, if found to be faulty, then there is no sufficient evidence of death by prussic acid, and the jury should acquit." The matter embraced in this request forms two of the questions which were elaborately tried and submitted to the jury. All of the details relating to the post mortem examination were carefully gone into, including the care with which the investigation was made, and the evidence upon that subject was

fully and fairly submitted to the jury. So, also, with reference to the chemical tests made by Dr. Vandenburgh, all of the details of the analysis were carefully examined ; his processes and work criticised and claimed to be faulty ; and the evidence upon this subject was also submitted to the jury. And then the court specifically instructed the jury: "I also further charge you that, if the expert evidence is such that it raises in your minds a reasonable doubt on the whole case,—that is, all of the evidence in the case,—so that, considering all the evidence, you have, on account of the nature of the expert evidence, a reasonable doubt as to the guilt, he is entitled to the benefit of that doubt, and to an acquittal at your hands." It would seem, therefore, that the matter embraced in this request has been fully and sufficiently submitted to the jury, and that there was no need of further instruction upon this branch of the case.

There were several other written requests which do not appear to have been charged in the form asked. Some might properly have been charged, but we think the substance was so nearly covered in the body of the charge that it cannot be held that harm has been done, or that all of the rights of the defendant have not been protected. There may be some technical errors or defects, but we think they are of such a character that they should be disregarded, under section 542 of the Code of Criminal Procedure.

After the conviction of the defendant, a motion in arrest of judgment and for a new trial was made, upon the grounds that the evidence was insufficient to warrant the defendant's conviction, that there was misconduct on the part of the jurors, and of newly-discovered evidence. Affidavits were presented showing conversations with a number of the jurors after the rendering their verdict, in which the testimony of witnesses was, to some extent, commented upon. These affidavits were met on the part of the jurors themselves, and they have been carefully considered in the opinion written by the trial judge upon his denial of the motion. There is but one juror whose conduct requires consideration here, and that is Gilmore. A number of witnesses made affidavit to conversations had with

him prior to his selection as a juror, in which he is said to have made statements which, if true, would have disqualified him from sitting as a juror. He makes an affidavit vigorously denying these charges. A question of fact is thus presented which has been disposed of by the trial judge, who appears to have believed the statement made by Gilmore. In view of the fact that the trial judge had the advantage of seeing and knowing this juror through the entire trial, we think that his credibility should properly be left with the trial court, and that we should not, on review, discredit his testimony, and accept that given by others.

It appears that Dr. Pugsley, in his testimony, gave evidence tending to show that he had witnessed a case of prussic acid poisoning when he was connected with the Erie county almshouse in 1869. The affidavits of the attorneys for the defendant show that they have made an examination of the records of the almshouse in that year, and did not find the case alluded to by the doctor. In answer to this, it is claimed that the records which are preserved and were examined by the attorneys were only the records of commitments to, deaths in, or discharges from said almshouse during the period from October 1, 1868, to October 1, 1869, and that, owing to the imperfect manner in which the records have been preserved, the examinations by these attorneys would not tend to contradict or seriously impair the testimony of the doctor. We think the motions in arrest of judgment and for a new trial were properly denied.

The defendant has been represented by counsel, who presented this case to the court with an argument seldom equaled in this forum for force, ingenuity, and ability. Every question raised required careful and serious consideration. We have given the case much time and careful thought, but have found no error which requires a new trial. The judgment of conviction should be affirmed.

All concur, except VANN, J., dissenting.

Judgment affirmed.