(66 App. Div. 415.)

PEOPLE v. BISHOP.

(Supreme Court, Appellate Division, Fourth Department. November 26, 1901.)

1. CRIMINAL LAW—JURORS—DISQUALIFICATION—FINDING OF FACT.

Where a motion for a new trial presenting a question of fact as to disqualification of a juror was denied pro forma by the county court, with the express statement that the question of fact was not decided, but reserved for the appellate division, which refused to consider an appeal from an order in that form, and remanded the case for further action, whereupon the motion was again denied, but without qualification, the appellate division will not consider itself required to defer to the apparent finding that the juror was not disqualified.

2. SAME—EXPRESSION OF OPINION—SUFFICIENCY OF EVIDENCE.

Where five credible witnesses made affidavit that a juror in a criminal prosecution, who had on voir dire examination denied that he had formed or expressed any opinion, had on several occasions expressed anxiety to be a member of the jury, declaring his opinion that accused was guilty, and should receive the maximum penalty, and there was no showing that affiants were unfriendly to the juror or interested in aiding accused, the evidence proving that the juror was disqualified was so convincing as to warrant the reversal of an order denying a motion for a new trial on the ground of disqualification.

3. SAME—INHERENT POWER TO GRANT NEW TRIAL.

In such case the court has inherent power to set aside the verdict and direct a new trial, even though the juror's action did not amount to "misconduct of the jury" furnishing ground for a new trial under Code Cr. Proc. § 465, subd. 3.

4. SAME—WAIVER OF OBJECTION.

Where, after the jury had been selected, but before the introduction of evidence, in a criminal case, defendant's counsel received an anonymous letter stating that a juror had expressed a determination to secure defendant's conviction if possible, but at a conference between counsel, judge, and juror the latter denied the charge contained in the letter, the action of defendant's counsel in proceeding with the trial did not waive the right to raise the question of the juror's disqualification on motion for a new trial.

Appeal from Allegany county court.

Gabriel Bishop was convicted of manslaughter in the second degree, and appeals both from the judgment and from an order denying a motion for a new trial. Reversed.

Argued before ADAMS, P. J., and McLENNAN, SPRING, WILLIAMS, and HISCOCK, JJ.

H. J. Parton Swift, for appellant.
F. H. Church, Dist. Atty., for the People.

WILLIAMS, J. The order denying the motion for a new trial should be reversed, the judgment upon the conviction reversed, the

verdict of the jury set aside, and a new trial ordered. We place our decision upon the ground that the juror Lewis, complained of, was incompetent, and was guilty of misconduct on the trial. The indictment was for manslaughter, second degree, in causing the death of one Everett G. Austin, July 8, 1899, at the town of Cuba, Allegany county, without design to effect death, by exploding dynamite under a cottage in which Austin was at the time. The indictment was filed October 21, 1899, and the defendant was arraigned the same day, and pleaded not guilty. The trial began February 19, 1900, and resulted in a conviction, and the judgment appealed from. The defense consisted of a persistent denial that the defendant exploded the dynamite under the cottage. The court at which the trial took place commenced February 12, 1900, and the trial commenced the second Monday of the term. Among the jurors summoned to attend that term was one Mortimer G. Lewis, a farmer, residing in the town of Andover, and who was engaged in pumping oil wells near his home. He attended during the first week of the term, and was home on Saturday, February 17th, and remained over Sunday, returning to court on the following Monday. Norman P. Brainard, a practicing physician and surgeon, who had lived and practiced his profession at Andover since 1878, made affidavit that after Lewis was summoned as a juror, and shortly before the trial, he had a talk with him about this case, and he said that he would be a juror on it, and that he would teach him not to use dynamite; that they had considerable talk back and forth relative to the case, and that Lewis seemed particularly anxious to be upon the jury; that he had several talks with him in reference to the case, and the same was discussed by him and Lewis some time before the trial. John Wall, a resident of Andover, by occupation an oil driller, made affidavit that shortly before the trial he heard Lewis say, when speaking of the case, that he would be on the jury, and he would show him how to use dynamite; that he would show boys how to use or not to use it. Lee M. Trobridge, a resident of Andover, a farmer by occupation, made affidavit that he did the work for Lewis during his absence at court the first week of the term; that he came home to remain over Sunday, and on Saturday, February 17th, he conversed with him with reference to the trial of this case, which was understood to be set down for the next week, and in that conversation Lewis said that, in case he was one of the lucky ones to get on that trial, he wanted Trobridge to take care of his work while he was gone; that he expressed his desire several times to get on that jury; that he said, in substance, that he was in favor of capital punishment in that case; that he did not pretend to give the correct language, but that was the substance and meaning of what he said. Ezra B. Zeliff, a resident of Andover, made affidavit that on Saturday, February 17th, in a conversation between them, he asked Lewis what they were going to do with Bishop, and Lewis replied, "We'll learn him not to do it again." Milton A. Jordan, who was one of the regular panel of jurors attending that term of court, made affidavit that the forepart of the first week Lewis spoke to him about the case, and wanted to know whether he thought they would be on the

case; and that they had other talk about the case which he could not state. Lewis, the juror, made affidavit denying that he had any of the conversations given in the affidavits of the foregoing five witnesses. He was drawn, sworn, and examined on Monday, February 19th, as to his qualification as juror, and among other things stated that he had no opinion about the case; that he had not talked with any one about it; that he had heard it discussed,—that is, had just heard it spoken of, but had heard no opinion expressed about it; that he had heard since he came to court that the case was something about dynamite business. He was, at the close of the examination, accepted, and was sworn as a juror in the case. The jury was completed Tuesday, and sworn, and then the court adjourned until Wednesday morning, February 21st. After the adjournment of the court February 20th, the district attorney received some telephone from Andover with reference to statements said to have been made by Lewis before he came to court which rendered him incompetent to sit in the case; but it was impossible to get any facts by telephone. On Wednesday morning, February 21st, after the district attorney had opened the case, and a witness had been sworn, an anonymous letter was received by defendant's counsel, which read as follows:

"Confidential.                    Andover, N. Y., February 21, 1900.

"J. O. Leggett, Belmont, N. Y.—Dear Sir: Mortimer G. Lewis, one of the jurors drawn from this town, said to Ezra Zeliff that he would be on the jury, and would learn that young man not to use any more dynamite, or in substance this."

This letter was at once shown to the district attorney and the presiding judge, and a conference was thereupon had in another room; the judge, the district attorney, the defendant's counsel, and the juror Lewis being present. Lewis was informed of the charge made against him, and of the contents of the anonymous letter, and was asked if it was true, and he earnestly and emphatically denied the charge, and said Zeliff was not entirely reliable. He was told by the judge and district attorney most emphatically that they did not want any man upon the jury who was not entirely fair and impartial and free from any preconceived opinion; and he replied distinctly that he had no preconceived opinions, and said he did not make the remark attributed to him by Zeliff, nor anything like it, to Zeliff or any other person. He gave this assurance repeatedly with much emphasis, and in an apparently candid manner. The defendant's counsel believed him, as did also the judge and district attorney, and the trial thereupon proceeded; Lewis remaining on the jury, and participating in rendering the verdict. The judge, the district attorney, and defendant's counsel had no knowledge or information, at the time of the conference referred to, of any of the matters sworn to in the five affidavits hereinbefore referred to, except the telephone and the anonymous letter; and these were not believed, but supposed to be mere rumors. Upon the juror's examination under oath and his statements at the conference they all believed him to be an honest, impartial juror. After the trial was over, information led to the procuring of the five affidavits and the making of this motion.

These are concededly the facts, and they are not disputed, except as to the statements in the five affidavits, which were denied by the juror Lewis.

The first question to be determined is one of fact,—whether the juror made the statements sworn to in the five affidavits. It may be said that this is the only question, because upon the determination of this question the decision of this motion should rest. It is suggested that the Benham Case, 160 N. Y. 402, 55 N. E. 11, is authority for the proposition that we should not interfere with the conclusion arrived at by the county judge upon the facts. In that case the court said (page 447, 160 N. Y., and page 26, 55 N. E.):

"A number of witnesses made affidavit to conversations had with the juror prior to his selection as such, in which he is said to have made statements, which, if true, would have disqualified him from sitting as a juror. He made an affidavit vigorously denying these charges. A question of fact was then presented, which has been disposed of by the trial judge, who appears to have believed the statement made by the juror. In view of the fact that the trial judge had the advantage of seeing and knowing this juror during the entire trial, we think that his credibility should properly be left with the trial court, and we should not, in review, discredit his testimony, and accept that given by others."

The original order, entered May 11, 1900, denying the motion, contained the following language:

"Said motion having been submitted without argument, it is ordered that said motion be, and each one is hereby, denied pro forma, and without deciding the question of fact raised by the above-mentioned affidavits as to the competency of the juror Lewis, which questions are reserved for the appellate division."

Upon the original argument of the appeal, our attention being called to this language in the order, we refused to consider the appeal therefrom, and sent the matter back to the county judge for his further action. The case comes back to us now with the supplemented order entered November 7, 1901, which recites that, "the appellate division having directed that said motion be again considered, and the same having been submitted," and then orders "that said motion be, and each one is hereby, denied." In these circumstances we do not feel bound by the suggestions made in the Benham Case, but should examine and consider this question of fact upon its merits. We cannot agree with the county judge in the conclusion he reached. There is not a particle of evidence in the record tending to discredit these five witnesses. They were all neighbors of Lewis, except one, who was a fellow juror at the court. One was a physician and surgeon, who had lived and practiced his profession in Lewis' town since 1878, and the others were well-known citizens; and no effort was made to show any reason or motive for their testifying untruly. Their character and reputation were in no way attacked. It was not suggested that they were unfriendly to the juror Lewis, so as to have any desire to injure or disgrace him, or that they had any friendly relations with the defendant or his family or his counsel, so as to have any desire to assist them. We can conceive of no reason why they should make the affidavits if they were untrue, and the conversations sworn to by them had taken place so

recently that their recollection could not very well be at fault. We agree that motions of this kind should be very carefully considered, and the affidavits closely scrutinized, and that no mistake should be made in setting aside verdicts by reason of attacks made upon jurors after the trials have been had and verdicts of conviction rendered; that, unless great care is exercised, abuses are liable to grow up, and charges against jurors to be falsely made after convictions are had, for the purpose of relieving accused persons from convictions for crimes. But the rights of accused persons must be protected, and it will rarely occur that false charges can be gotten up after a trial without something appearing which will at least create suspicion of such wrong. Here there is absolutely nothing to suggest that these affidavits may have been dishonestly made or procured. There were rumors about this juror at the very commencement of the trial. The suggestion did not first originate after the conviction of the defendant was had. A conference was had between counsel and court. The rumor seemed to have no foundation in fact. The juror asserted his innocence. Every one was satisfied, and the trial proceeded. We have considered this matter very carefully, have examined everything relating to it contained in the record, and the conclusion appears to us irresistible that these five affidavits are true, and that the juror is correctly reported therein. Having arrived at this conclusion, the court cannot hesitate as to the disposition it should make of this appeal.

It is said the court below had no power to set aside the verdict and order a new trial, and that this court can afford the defendant no relief. It cannot be doubted that a person on trial for a high crime is entitled to a fair trial before an impartial jury. The constitution guaranties him this right, and no statute can deprive him of it. If the conduct of this man Lewis is not to be regarded as "misconduct of the jury" for which a new trial may be granted under the provision of Code Cr. Proc. § 465, subd. 3, then the court has inherent power outside the statute to afford such relief; and any provision of the Code prohibiting the exercise of such power would be void, as in contravention of the constitutional rights of the defendant. It was not suggested in the Benham Case that there was want of power in the court to grant such relief, and we think there is no authority for the claim made that the power does not exist. It is to be regretted that this juror was allowed to sit in the case, and that the verdict must therefore be set aside; but no one appears to be responsible for it except the juror himself. Upon the mere suggestion that a rumor was abroad that the juror was not competent to sit, the defendant's counsel, the district attorney, and the court did all they could to ascertain the truth about it. A mere rumor and an anonymous letter were not alone sufficient to call upon the counsel and the court to believe that the juror, against his earnest protestations, was guilty, and to disgrace him by excluding him from the jury. There was no waiver by the defendant's counsel of the question as to the juror's incompetency resulting from the rumor and anonymous letter. Granting that they were called upon thereby to make inquiry, they did all they could do under the circumstances. They were de-

ceived by the juror, the same as the district attorney and the court were. They all believed, as a result to their conference with the juror, that he was a fair, impartial juror; otherwise the court and the district attorney, as well as the defendant's counsel, would have insisted that he be excluded from the jury. There was no legal obstacle in the way of doing so at the time the conference was had. The record does not show that any evidence had then been taken, and, if not, then under the provisions of the Code of Civil Procedure the juror could have been excluded, and another juror called to take his place. A witness had been sworn, and, though the record does not so state, it is claimed that a little evidence of a formal kind had been taken. Assume this to have been the case, then, if a change in jurors had been made, and the same evidence had been again placed before the jury, no injury would have been done the defendant thereby, and no cause for a reversal of the judgment on appeal would have been presented. The counsel should, so far as possible, have removed all improper persons from the jury by the exercise of its right of challenge. In order to ascertain if causes of challenge exist, jurors are called, sworn, and examined as to their qualifications to serve on such, and that course was adopted with this juror. Instead of telling the truth when examined under oath, he committed deliberate perjury,—stated he had formed no opinion, had talked with no one about the case, had heard nothing about it except that there was such a case to be tried, and that it was something about dynamite business. The counsel were thus deceived, thrown off their guard, and deprived of the means provided by law to ascertain if the juror was qualified to sit in the case. This juror had apparently heard what the case was, had become satisfied that accused was guilty, and had made up his mind to get on the jury, and do what he could to procure his conviction and punishment. He had the conversations sworn to in the five affidavits, and, when called as a juror in the case, by his evidence concealed his condition of mind, and when called to the conference again falsified as to the matter, and thus succeeded in retaining his position on the jury. He was incompetent and unfit to sit upon this jury. The defendant was entitled to be tried by, and to have his case passed upon by, a full jury of 12 fair, honest, impartial men. He was deprived of that right in this case, and his conviction and the judgment thereon must therefore be reversed and set aside, and a new trial ordered.

The order denying the motion for a new trial and the judgment appealed from should be reversed, the verdict set aside, and a new trial ordered. All concur.