## Court of Appeals.

October 13, 1903.

## THE PEOPLE v. PHILIP D. MONTGOMERY.

(176 N. Y. 219.)

1. MURDER—EVIDENCE OF REPUTATION FOR UNCHASTITY OF A PARAMOUR OF ONE ACCUSED OF WIFE MURDER INADMISSIBLE.

Upon a trial for the murder of a husband or wife, the improper relations of the accused survivor with persons of the opposite sex may be given in evidence upon the subject of motive; but evidence is inadmissible as to the reputation for unchastity of the paramour of one accused of wife murder.

2. SAME—CODE CRIMINAL PROCEDURE, SEC. 542.

The error in the reception of such evidence cannot be overlooked as technical or unsubstantial under the powers conferred by section 542, Code Criminal Procedure.

3. SAME—CHARGE—FAILURE OF COURT TO DIRECT JURY TO DISREGARD
THEORY OF PROSECUTION WHOLLY UNSUPPORTED BY EVIDENCE.

Where in order to sustain a theory of the prosecution that de-
fendant had quarrelled with his wife and had assaulted her, frac-
turing her skull, and to escape exposure had shot her, a stick found
in the room where her body lay is introduced in evidence, but there
was a failure to prove the theory of assault, the court should have
sharply directed the attention of the jury to that fact, and have
restrained the counsel for the prosecution, in his summary to the
jury, from commenting upon a theory that had collapsed for want
of evidence, and refusal to do so on request of defendant's counsel
constituted reversible error.

APPEAL from a judgment of the Supreme Court, rendered
at a Trial Term for the county of Delaware, June 23, 1902,
upon a verdict convicting the defendant of the crime of murder
in the first degree.

The facts, so far as material, are stated in the opinion.

Robert M. Moore, for appellant.

George A. Fisher, District Attorney (Ewin D. Wagner, of
counsel), for respondent.

WERNER, J.: The gruesome tragedy out of which this ap-
peal arises took place in the town of Hobart, Delaware county,
on the 30th day of March, 1901, when Amelia B. Montgomery
came to her death by means of a bullet wound inflicted by her
husband, the defendant, who was subsequently tried and con-
victed upon the charge of murder in the first degree.

The death and its cause having been established beyond
controversy, the dominating issue of the trial was whether the
act of the defendant proceeded from a conscious, sane, respon-
sible mind, or whether it was an accident due to a seizure,
said to be epileptic in its nature, as a result of which the de-
fendant unconsciously or involuntarily caused his wife's death.
Much evidence was adduced upon this issue. The prosecution

presented a case which tended to invest the defendant's act with the elements of motive, premeditation, deliberation and sanity. The defense sought to establish the irresponsibility of the defendant, but, as the sequel shows, without success. If, therefore, the sole question presented by this record were whether the verdict is supported by the weight of the evidence, we could not reverse the judgment without invading the province of the jury, for there was competent evidence upon every branch of the case which raised a substantial issue of fact. There are presented for our consideration, however, many exceptions taken by the defense to the rulings of the learned trial court, and, after a careful examination of them all, we have arrived at the conclusion that two of these rulings appear to be so seriously erroneous as to necessitate a new trial. In view of this fact and of the concession of the defense that the killing of Amelia B. Montgomery was the act of the defendant, we may safely and materially shorten the discussion of the case by confining our review to the matters which bear upon these two rulings.

The proof as to motive or motives proceeded along several distinct lines. Upon one branch of this question the prosecution produced evidence showing that during nearly the whole of the interval between the death of defendant's first wife in June, 1896, and his subsequent marriage in March, 1900, one Harriet Wood had lived with him as his housekeeper. She remained in his employ until the early autumn of 1900, or several months after his second marriage. It was contended for the prosecution that during this interval, between 1896 and 1900, the defendant had formed an illicit alliance with Harriet Wood, which, if not actually continued after defendant's second marriage, was covertly cherished by him, causing discord between him and his second wife and creating one of the motives which inspired the commission of the crime charged in the indictment.

In support of this theory the prosecution adduced evidence showing that in the spring of 1900, the defendant, with three hired men and Harriet Wood, went to the Kaaterskill mountains, where the defendant had a contract to supply certain hotels and cottages with dairy products during the summer season, and lived there together for three or four days before the defendant went back to Hobart for his wife. These hired men testified that they slept upstairs but that the defendant and Harriet Wood did not sleep there; that they did not know where they slept and that there was only one bed downstairs that they knew of. One of the men, Haynor, testified to a conversation with the defendant in which the latter took him to task for talking about Harriet Wood at the neighboring hamlett of Jewett Center, and said, " there is no use of going to my wife and reporting anything concerning anything that has been or what is done; what a woman doesn't know never made her head ache and such little things wont come out very well." This witness also testified that on one occasion when he was near the barn and Harriet Wood was outside of the house, the defendant called to her from a window, where he stood with his body nude as far down as the chest; that she went to the window and there the two conversed while he stood thus exposed. He also referred to a conversation between the defendant and his wife disclosing some difference of opinion between the latter and Harriet Wood, as to which one should deliver cream and butter to Mrs. Surgraft, and he stated that defendant sometimes sent his wife away with cream and butter in the evening so that she did not return until the following morning.

Another witness, Hollicus, who worked for the defendant from February to the latter part of May in 1900, testified to a conversation between the defendant and Harriet Wood shortly before the latter left the former. This witness stated that the defendant came into the barn at milking time, when Harriet

Wood said to him: "Harvey, I didn't think you would give me up in this way, or as easy as that, and he burst out crying and called her in one end of the barn and went talking to her. I could not hear what he said. After they got out there I don't know how long they talked; should think fifteen or twenty minutes, half an hour, or something like that. She went away next day. Harvey Montgomery took her away. They went in the morning, he came back next day; was gone over night." This witness also testified that Mrs. Montgomery objected to Harriet Wood's driving her horse.

Another hired man, Gray, testified that defendant requested him to ask Harriet Wood to stay with defendant when she was talking of leaving.

There was also evidence to the effect that in the January preceding the homicide the defendant went several times to a Mrs. Clark in Hobart to ascertain if she did not want a good girl for housework, with the result that Harriet Wood commenced work at Clark's on February 1, 1900. This was closely followed by another visit from the defendant, at which he arranged with Mrs. Clark to furnish her with milk, and continued to do so until after the homicide. During this period defendant called at Clark's a number of times and usually saw Harriet Wood.

It was further shown that on the day of the homicide there was a conversation between the defendant and one Stevens, in which the former asked the latter and his wife to go up and take charge of the Kaaterskill contract, and when Stevens demurred on the ground of his incompetency, the defendant said he would write a letter to Harriet Wood and get her to go with them, to which Stevens replied that his wife would not go with her. Several witnesses also testified that immediately after the homicide Harriet Wood and the doctor were the only persons whom the defendant requested to have sent for.

To offset the force and effect of the foregoing circumstances

upon the question of motive, the defense invoked a number of explanations and facts which appear in the record. We shall refer to only a few of them. The defendant was a man fifty-nine years of age. He was a farmer extensively engaged in raising hogs, and conducted a dairy in the Catskills. These enterprises required hired men, some of whom boarded with him. He became a widower in 1896, and until his marriage in 1900 he needed a housekeeper. In these conditions he secured the services of Harriet Wood, who remained with him for a number of years. Members of defendant's family and others who had worked for him testified that they had never witnessed any improper conduct between him and Harriet Wood. From these and other matters which bore upon the relations of the defendant and Harriet Wood, the defense argued that, even admitting all that was testified to in this behalf by the witnesses for the prosecution, nothing had been shown that was at all inconsistent with such an innocent and respectable intimacy as would be the natural outcome of a long period of constant association between a man and woman under the same roof in a rural community. The specific facts and circumstances thus presented by the prosecution and defense, respectively, to throw light upon the relations of the defendant and Harriet Wood, raised a legitimate issue upon the question question of motive which it was proper to submit for the consideration of the jury.

But the prosecution, not content with seeking to establish specific improprieties between the defendant and Harriet Wood, went further and threw into the balance the latter's reputation for unchastity. Six witnesses testified that her reputation in that regard was bad. That this evidence seems to have been based largely, if not entirely, upon her association with the defendant is not without significance, for if the speech of people in that community, as reflected in the testimony of disinterested witnesses, characterized that association as sinister

or meretricious, it is readily perceivable that it may have exercised a commanding influence upon the jury in reaching a determination upon the question of motive. The evidence of Harriet Wood's reputation for unchastity was directed to the question of motive and to no other. That question obviously bore a very intimate relation to the defendant's plea of irresponsibility, and it seems to be reasonably clear that if it was error to admit the evidence of Harriet Wood's reputation, it cannot be assumed to have been harmless to the defendant. We address ourselves, then, to the question whether the evidence of Harriet Wood's reputation for unchastity was competent.

It is the settled law of this State that upon a trial for the murder of a husband or wife, the improper relations of the accused survivor with persons of the opposite sex may be given in evidence upon the subject of motive. (People v. Hendrickson, 8 How. Pr. 404; People v. Nileman, 8 N. Y. S. R. 300; Stephens v. People, 19 N. Y. 549; People v. Stout, 4 Park. Crim. Cas. 71; Pierson v. People, 79 N. Y. 424; People v. Harris, 136 N. Y. 423; People v. Benham, 160 N. Y. 402; People v. Scott, 153 N. Y. 40; People v. Buchanan, 145 N. Y. 1.) The same rule obtains in many other States. (State v. Watkins, 9 Conn. 47; Hall v. State, 40 Ala. 31; Johnson v. State, 94 Ala. 35; O'Brien v. Commonwealth, 89 Ky. 354; State v. Duestrow, 137 Mo. 44; Duncan v. State, 88 Ala. 31; Pettit v. State, 135 Md. 393; St. Louis v. State, 8 Neb. 405; Stricklin v. Commonwealth, 83 Ky. 566, and People v. Brown, 130 Cal. 591.) It is supported in such text works as Lawson on Presumptive Ev. (p. 495); Wills on Cir. Ev. (6th Am. ed. p. 41); Burrill on Cir. Ev. (p. 285); Underhill on Crim. Ev. (sec. 323), and is doubtless the law wherever the principles of the common law prevail. The reason of the rule has been stated in great variety of language, but the substance of it is that evidence of this character tends to repel the presumption of love and affection that arises out

of the marital relation, and to establish a motive for the desire to get rid of one who, under normal conditions, would be the natural object of kindness and protection.    Thus, as we have said, the facts and inferences which were based upon specific occurrences, bearing upon the relations of the defendant and Harriet Wood, were properly received in evidence.    Some of them, it is true, might have been discarded by the jury as of too little probative weight and force, but they were, nevertheless, competent for what they were worth.

The prosecution seeks to justify the evidence of Harriet Wood's reputation for unchastity under the rule above referred to, but it is important to note that not a single case has been cited by counsel, nor brought to light by the research of the court, which holds that such evidence is competent.    Counsel for the prosecution cite the cases of Harris, Buchanan, Scott and Benham (supra), to sustain their contention, but none of them go further than to declare the well-established general rule that specific acts, declarations, conduct and occurrences, tending to show improper relations with a person of the other sex, are admissible evidence against one accused of the murder of husband or wife.    The fact that the reported cases and the text books are, at this late day, barren of any discussion upon the admissibility of evidence as to the reputation for unchastity of the paramour of one accused of wife murder, is in itself a cogent argument for the inadmissibility of such evidence.

It would serve no good purpose, and would tend to undue prolixity, to attempt a statement of the different classes of cases in which evidence of personal reputation is admissible. It is enough to say that it is only competent where character is in issue.    Since character, which is what a man is, cannot be proven, the law makes a virtue of necessity and resorts to proof of reputation, or what people say of a man, as the next best thing.    Evidence of reputation is one of the exceptions

to the rule excluding hearsay evidence, and, in common with all the exceptions to that rule, is resorted to only because more direct evidence is not obtainable. To this very general statement it may be added that, usually, the only character or reputation that can ever be in issue is that of a party or a witness. There are a few exceptions not germane to this discussion. In the case at bar, Harriet Wood was neither a party nor a witness. Her character was not in issue. Proof of her reputation for unchastity served no purpose except, possibly, to prejudice and inflame the minds of the jury against the defendant. All the facts and circumstances bearing upon the relations of the defendant and Harriet Wood were in evidence. If they pointed with reasonable certainty to a guilty alliance between the two, it added nothing to their weight and cogency to go further and prove the woman's reputation for unchastity. If, on the other hand, these facts and circumstances, standing alone, might have been regarded by the jury as entirely consistent with an innocent and respectable intercourse between this man and woman, it must follow that they furnished no evidence of a motive for murder without being supplemented by proof of the woman's bad reputation. In either event this evidence had a tendency to create a prejudice against the defendant, and to injure him, without proving a single fact against him. The specific occurrences in which Harriet Wood and the defendant were shown to have figured together, after the latter's second marriage, were competent evidence against him, but the former's reputation was not a legitimate issue in the case. Even if it had been, there was no evidence that the defendant knew of it and that, of itself, was a sufficient reason why it should not have been used against him. It is to be observed, moreover, that this evidence of Harriet Wood's reputation, which was not limited to the period succeeding defendant's marriage to the deceased, related, in part at least, to a period as to which evidence of specific acts of intimacy between

Harriet Wood and the defendant would have been incompetent against the latter under the rule in People v. Straight (148 N. Y. 570), where it was held that it was not competent to prove defendant's relations with his alleged paramour during his separation from his first wife, from whom he was afterwards divorced, for the purpose of showing a motive to kill his second wife whom he married after the occurrences proved. So much might be said against the competency of this evidence of Harriet Wood's reputation that it is more difficult to choose than to find reasons for condemning it, and we shall leave the discussion of this branch of the case with the statement that we regard it as utterly incompetent. Since several possible motives were assigned for the alleged murder, we are unable to say which particular one, if any, the jury may have regarded as the true one, but we cannot doubt that if they looked for a motive in the relations of the defendant and Harriet Wood the evidence of her reputation proved a controlling factor in the finding of the verdict of guilty. Thus we are driven to the conclusion that the error in receiving this improper evidence is not one that we can overlook as technical or unsubstantial under the powers conferred upon us by section 542 of the Code of Criminal Procedure.

We think it was error also for the trial court to refuse to charge, upon the request of counsel for the defense, that there was no evidence that a certain wooden stick or bludgeon or rolling pin, as it has been variously described, had been used by the defendant in the commission of an assault upon the deceased prior to the shooting. The force of this ruling becomes apparent upon a brief recital of the facts relating to that part of the case.

The deceased was found in bed with a severe fracture of the skull surrounding a bullet wound which entered the head at the right temple bone and had its exist behind and below the ear near the occipital bone. Her eyes were closed, the bed

clothes were tucked under her left side and shoulder, and her hair, contrary to her usual custom upon retiring, was coiled about her head in the same manner as she was wont to wear it during the day. Her face, hair, and the pillow upon which she lay, were badly scorched. The stick of wood in question was found lying upon a bureau in the room. As there was no eye-witnesses to the shooting, and there was no superficially apparent motive for it, the prosecution naturally seized upon every theory that might give a clue to the inspiration for the deed. One of the theories evolved by the prosecution was that the defendant and his wife had a quarrel over the Kaaterskill contract, a renewal of which had been obtained by the defendant on that day; that in the heat of passion engendered by this quarrel the defendant had assaulted his wife with the stick of wood or bludgeon, thus fracturing her skull, and that when the defendant realized the serious consequences of his assault he decided to kill his wife to escape exposure. The difficulty with this theory is that, beyond the existence of the stick, the renewal of the Kaaterskill contract and the manner in which deceased wore her hair, there is not a fragment of evidence to sustain it. The stick of wood bore no evidence of having been used in the commission of an assault, and was shown to have been an instrument used in the pressing of the sleeves of women's garments. The physicians who performed the autopsy, and who were called as witnesses for the prosecution, testified that there was no such abrasion or discoloration of the inner skin surface as would be found in case of severe external violence from a stick or club, and that the entrance of a bullet fired at such close range as to scorch and burn the face and hair of the deceased and the bed clothing, was a sufficient cause for the fracture of the skull. There was nothing to show that there had been a quarrel between the defendant and his wife, and, in a word, there was an utter failure of evidence to sup-

port the theory that the defendant had committed an assault upon his wife before he shot her.

It is argued for the prosecution that they were entitled to lay before the jury all the circumstances connected with the homicide, and, therefore, it was competent to put in evidence the stick of wood found in the room where it occurred. That is true to the extent that the stick of wood, in and of itself, was no more and no less competent than any of the other physical surroundings of the alleged crime. It was in the use of this particular thing, for a purpose not justified by the evidence, that error was committed.

We do not coincide with the views of counsel for the defense, that because the indictment charged murder by means of a gunshot wound, it was error for the court to receive the stick of wood in evidence, or to permit counsel for the prosecution in his opening to present to the jury the theory that the defendant had assaulted and injured the deceased before he shot her; on the contrary, we think it was proper for the court to allow counsel to exploit that theory upon the assumption that it would be followed by evidence to support it, and in that view of the case, the stick of wood was, in the first instance, properly received in evidence. But when the proofs had been closed, and there had been a palpable failure to prove the theory of assault, the court should have sharply directed the attention of the jury to that fact, and have restrained counsel for the prosecution, in his summary to the jury, from commenting upon a theory that had collapsed for want of evidence; and then the court should have charged, as requested by defendant's counsel, that there was no evidence that the stick of wood had been used upon the deceased.

None of these things were done. There was no admonition to the jury to disregard the opening statement of counsel for the prosecution upon the theory of assault. The court refused to charge as requested by defendant's counsel. In his

summary to the jury counsel for the prosecution was permitted to say: " It may be, gentlemen, that this bludgeon was used in the argument not with the intent or purpose of taking her life, but it was used and the woman became unconscious, and this man believing that he had killed his wife had resort to the gun to finish the job. . . . Where is the evidence to show that they did not have an altercation there before she went to bed? It is a fair inquiry to say where is the evidence to show they did not? The dead woman, with her head crushed, there in bed, is evidence that at some time during that night there was a disturbance and a breach of friendliness between them. With her there in her blood some one is called upon to explain it to show what the relations were which immediately preceded this thing they called an accident. Where is the explanation? Gentlemen, where is it? Why, never a witness has testified to it."

These remarks of counsel were supplemented by the following language of the court in the course of the charge: " In the discussion of this case another motive has been suggested by the counsel for the People, and that is that the crime of murder was committed to conceal another crime. The theory of the prosecution is that Montgomery, in the heat of passion or for some other cause, struck the deceased on the head with a rolling pin, which was found on the bureau at the foot of the bed after the tragedy; that the depression or indentation on the left side of the forehead was made with a blow from the instrument, and that, to conceal this assault, she was afterwards placed in bed by him and shot through the head. In support of this theory evidence has been given tending to show that it was a habit of the deceased to take down her hair and braid it before retiring, and that this night her hair was not down but in a coil near the top of her head. The prosecution claims that this fact, and the fact that the bed clothes were carefully tucked under her side; that they were not back on the side occupied

by the defendant, but drawn up nearly to the pillow, as well as the position of the body, the position of the arms crossed on the abdomen, and the fact that the skull was broken and indented, shows that an assault was made before the shot was fired and before she was placed in bed. It is true that one of the physicians has testified that, in his opinion, the dent or depression in the forehead was caused by the bullet, but you are not bound to accept his opinion as true. You should give to this evidence such weight as you think it is entitled to in view of all the evidence in the case. As I said before, when an expert states a scientific fact, his opinion is speculative and theoretical, and he states only his belief, or where some other theory is equally consistent with the facts. If you are convinced, beyond a reasonable doubt, from all the evidence in the case, that the crime of assault was made by the defendant upon the deceased, you will then determine whether it was the moving power that impelled the defendant to shoot the deceased, and, if you are convinced, beyond a reasonable doubt, that this was the motive that induced the act, you will give it such force and effect as you think it entitled to, no matter what the opinion of the physician may be as to the cause of the indentation."

We cannot say that the conduct of the trial in this regard did not affect the result. The refusal to instruct the jury that there was no evidence of an assault prior to the homicide, followed by the impassioned appeal of counsel and the solemn words of the court, which tended to dignify this theoretical assault into a reality, may well have been potent in shaping the verdict.

The judgment herein should be reversed and a new trial ordered.

PARKER, Ch. J., HAIGHT, MARTIN, VANN, CULLEN, JJ. (and GRAY, J., on first ground of error discussed), concur.

Judgment of conviction reversed, etc.