## COURT OF APPEALS.

# THE PEOPLE v. GEORGE HARRIS.

### June 17, 1913.

### (209 N. Y. 70.)

(1.) MURDER—TRIAL OF DEFENDANT CHARGED WITH MURDER OF HIS
WIFE—EVIDENCE OF PREMEDITATION AND DELIBERATION.

On trial of defendant for the murder of his wife by shooting, the
evidence showed that six attempts were made by him to discharge
a revolver, four of which were successful, and, further, that the re-
volver was placed in the hand of the victim so as to simulate sui-
cide, indicating the consciousness of having committed a premedi-
tated crime. *Held*, that the jury was justified in finding the pre-
meditation and deliberation requisite to constitute the crime of
murder in the first degree. (*People* v. *Ferraro*, 161 N. Y. 365, 375,
followed.)

(2.) SAME—WHEN EVIDENCE INSUFFICENT TO ESTABLISH FACT THAT DE-
FENDANT HAD A PARAMOUR.

It is well established that when a husband is charged with the
murder of his wife it is competent to show his relations with a par-
amour for the reason that such evidence tends to establish the
absence of affection for the wife and a motive for getting rid of her.
The rule, however, does not extend so far as to permit proof for the
same purpose of mere temporary intimacy with a prostitute, par-
ticularly where such intimacy existed at a time when the husband
and wife were voluntarily living apart. (*People* v. *Montgomery*,
176 N. Y. 219, 225, distinguished.)

(3.) SAME—WHEN PARTICIPATION OF A NEW PRISONER IN MAKING IN-
STRUMENTS FOR BREAKING JAIL NOT SUFFICIENT EVIDENCE
OF ATTEMPT TO ESCAPE TO SHOW CONSCIOUSNESS OF GUILT.

The mere participation of a new prisoner in the fashioning of a
possible instrument of escape which previous inmates of the jail
had begun to construct before his advent cannot be regarded as
evidence of the guilt of such new prisoner within the rule which

permits an inference of guilt from an attempt to escape arrest or incarceration.

(4.) SAME.

Evidence, although probative, may be too slight, conjectural or remote to be admissible or may complicate and confuse the case too much, the rule being that the law forbids unnecessary complication, delay and tediousness.

(5.) SAME—ALLEGED ADMISSION BY DECEASED TO DEFENDANT THAT SHE WAS PREGNANT BY ANOTHER MAN—IMPROPER EVIDENCE IN REBUTTAL THEREOF.

Upon the cross-examination of the defendant, when questioned in regard to the statement which he attributed to his wife, and which was urged as indicating that he killed her in the heat of passion, that she was in the family way by another man, he answered: " I had no other information as to her condition except what she told me, in no way, shape or form." The district attorney contended that any fact which rendered it improbable that the wife would make such a statement in reference to her conduct was relevant to the issue. With this view, over objection and exception, he introduced in rebuttal the testimony of two women as to the condition of the wife's clothing indicating that menstruation had not ceased at the period to which her alleged declaration referred; and, also, the testimony of two physicians who examined the remains of the wife, which had been exhumed during the trial at the direction of the district attorney, and ascertained from their examination of the uterus that the wife was not pregnant at the time of her death. *Held*, that while the non-existence of the facts said to have been declared by the wife is a circumstance of probative force tending to some extent at least to render it improbable that she actually made the statement attributed to her, such evidence introduces a collateral issue into the case tending to obscure the main issue in the minds of the jury and to protract the trial to an unreasonable extent, and hence was improperly admitted.

(Argued April 30, 1913; decided June 17, 1913.)

APPEAL from a judgment of the Supreme Court, rendered February 22, 1912, at a Trial Term for the county of Wyoming, upon a verdict convicting the defendant of the crime of murder in the first degree.

The facts, so far as material, are stated in the opinion.

*L. A. Walker* for appellant.   The evidence as to defendant's relations with women of questionable character was improper and incompetent and prejudiced the jury against him.   (People v. Scott, 153 N. Y. 40.)   The testimony attempting to show that the defendant was engaged with other prisoners while in jail in making a key to fit the jail door was improper and incompetent.   (People v. Fitzgerald, 156 N. Y. 253; People v. Flanigan, 42 App. Div. 318; People v. Place, 157 N. Y. 584; People v. McLaughlin, 150 N. Y. 386; People v. Corey, 148 N. Y. 476.)

*M. L. Coleman, District Attorney* (*John Knight* of counsel), for respondent.   Evidence of relations between defendant and women other than his wife was competent to prove loss of affection for deceased, and motive.   (People v. Wilson, 109 N. Y. 352; People v. Kemmler, 119 N. Y. 580; People v. Tice, 131 N. Y. 661; People v. Harris, 136 N. Y. 423; People v. Benham, 160 N. Y. 402; People v. Montgomery, 176 N. Y. 227; People v. Ferraro, 161 N. Y. 365; People v. Fish, 125 N. Y. 136.) Evidence that defendant attempted to break jail was competent. (People v. Ryan, 79 N. Y. 601; People v. McKeon, 46 N. Y. S. R. 69; People v. Petmecky, 2 N. Y. Cr. Rep. 450; People v. Rathbun, 21 Wend. 518; People v. Sullivan, 173 N. Y. 134; People v. Conrad, 102 App. Div. 570.)   The evidence of witnesses as to the physical condition of deceased as regardss pregnancy was competent.   (5 Wigmore on Ev. 30, § 263; Knapp v. State, 79 N. E. Rep. 1076; Comm. v. Hourigan, 89 Ky. 312.)

WILLARD BARTLETT, J.   The defendant has been convicted of the premeditated and deliberate killing of his wife by shooting her to death at the village of Perry, in the county of Wyoming, on the 20th day of November, 1911.   Upon the trial, at the close of the People's case, his counsel in the course of his opening address to the jury admitted that the defendant fired the fatal

shots, but said it would be claimed that he was not in a condition to be responsible for the act.

At the time of the homicide George Harris and Beatrice, his wife, were boarding and lodging at the house of John W. Wheeler in the village of Perry, occupying a room on the second floor. They were respectively twenty-five and twenty-one years of age. He worked in a cutlery manufactory and she in a knitting mill in the village. They were married on December 8, 1906, in Perry, being both then engaged in the same employments. There had been two separations of the couple during their married life; one in 1910, when the wife gave birth to a child who survived but a short time; and the other from February to the early part of October, 1911, in consequence of the husband's drinking habits. The reconciliation which terminated this separation appears to have been due to the husband's advances quite as much as to the wishes of the wife. After they thus came together, at the beginning of October, 1911, they seem to have lived in harmony at Mr. Wheeler's in Perry until the evening of the homicide.

On that day the defendant left off work about 10 o'clock A. M. because he did not feel well, and spent most of the time until evening frequenting a poolroom with the exception of a visit home for dinner, when he met his wife and accompanied her part way to the knitting mill, to which she went to resume work in the afternoon. He stayed around this poolroom until after 6 o'clock and drank a good many bottles of beer; he says possibly ten or twelve. Returning home while the Wheeler household were at supper, he went to the room occupied by himself and his wife where she speedily joined him. Mr. and Mrs. Wheeler and the other boarders went out early in the evening and none of them had returned at the time of the tragedy which ensued. At about 8 o'clock the report of several pistol shots and the scream of a woman, apparently proceeding from the Wheeler house, were heard by the occupants of dwellings in

the vicinity. Shortly afterward, the defendant, apparently in a condition of great emotional excitement, appeared at the door of a neighboring residence and asked the inmates to get a doctor, saying that his wife had shot herself, and adding, in response to an inquiry as to what the trouble was: " Oh, we had a few words and I went out; oh, if she had only waited! "

A ghastly picture was revealed to the physicians and others who hastened to the defendant's room. His wife lay dead in her chair, evidently shot to death, by a revolver which the incomers found held in her right hand. There were four wounds on her body any one of which was sufficient in and of itself to have caused death. One cartridge remained intact in the pistol, except that it was dented in such a manner as to indicate that two efforts had been made to discharge it; the shells of the four other cartridges were empty.

From the very first the defendant insisted that his wife had committed suicide. According to his earlier statements, a controversy had arisen between them in regard to his drinking, shortly after he came in; this went on until she asked him to get her a glass of water; while he was out in the hall on his way to procure it, he heard a shot; and returning to the room he saw smoke around his wife's head, upon which he rushed out, calling for Mrs. Wheeler.

When the defendant took the stand as a witness, after the concession of his counsel that he had fired the fatal shots, his account of the events immediately preceding the tragedy was as follows:

" I went home and went up stairs; took my hat and coat off. I don't remember whether I hung them up or laid them on the bed. Took a drink of whiskey out of the bottle and sat down on the bed. My wife then came up and went over and sat in a chair. I kind of laid down on the bed there and we talked of different things. I can't remember all we said; something about going to keeping house. I don't remember all that was—

I think we mentioned about a pillow she was raffling off, and I felt sick and I vomited in the bowl there in the room; and then I kind of laid down in the bed again for a while, I couldn't say how long, and I went and got another drink of whiskey out of the bottle, and my wife kind of objected to it, and we had a few words about my drinking. She said she thought I had had enough, that I didn't need any more. I took another drink of whiskey and went back and sat on the bed. She said she guessed she had made up her mind to leave me on account of my drinking; she was going away with the man she loved. I aske-- her who was that, and she said 'Ralph Traber.' I told her that he would not go with her, that he was out of her class. She said that he would have to for he had got her in the family way while we had been apart. She said he would have to take care of her; he had got her in the family way while we had been apart. I don't remember what happened after that until someone told me she had been shot."

The convenient presence of the revolver was explained by the statement that the defendant had taken it out of his trunk the day before and had placed it on the commode with the intention of selling it.

As the case went to the jury, the defense had resolved itself into the contention that in consequence of intoxication and the emotion aroused by his wife's declaration of her illicit relations with Traber the defendant was incapable of the premeditation and deliberation requisite to constitute the crime of murder in the first degree. The evidence, however, was sufficient to warrant the jury in rejecting this view and in returning the verdict which they did. As has been pointed out, six attempts were made to discharge the revolver, four of which were successful. The time which must have elapsed between the first and the sixth effort might well be regarded as a sufficient period within which deliberation was possible. (People v. Ferraro, 161 N. Y. 365, 375, 14 N. Y. Crim. 266, and cases therein cited.) And

the placing of the revolver in the hand of the victim so as to simulate suicide indicated the consciousness of having committed a premeditated crime. It is true the surrounding circumstances show that the premeditation and deliberation were of very short duration in all human probability; nevertheless, if these elements exist at all, they suffice to sustain a conviction of the highest degree of homicide.

It remains to inquire whether any error of law was committed upon the trial to the substantial injury of the defendant sufficient to nullify the jury's disposition of the questions of fact in the case. Here we encounter several serious obstacles to the affirmance of the judgment.

The apparent absence of any adequate motive on the part of the defendant for deliberately killing his wife was one of the difficulties of the prosecution in the way of obtaining a conviction of murder in the first degree. As indicative of the existence of a reason for desiring to get rid of his wife the district attorney introduced evidence of his intimacy with a prostitute and another woman of questionable character. A woman, who declined to state whether she was a prostitute or not, testified to meeting the defendant at Hornell four or five years ago and to having received visits from him from time to time after that for four or five months. It was two or three years prior to the trial when she had last seen him, although she had sent him a postal card as late as November, 1910. After stating that she did not remember that he had written to her on the subject of marriage, she said: " He might have made the remark or written in some of his letters, that we might be nearer to each other, or something like that; " but in answer to a question from the court she said she did not think that this was since she left Hornell over four years ago. The other intimacy which the prosecution was permitted to prove was with a woman named Bonita La Marez, known as the snake-charmer, who lived at a boarding house in Perry kept by Mrs. Anna E. Barber.

In the summer of 1910, at the time of the absence of his wife, the defendant called upon this woman on a number of evenings in each week. When told that he was a married man, Mrs. Barber said she thought it improper for the defendant to call there but she did not stop it. The prosecution was also allowed to prove that letters passed between the defendant and Bonita La Marez during the same period to the extent of three letters from each. Their contents were not shown, nor was there any proof of illicit intercourse between this woman and the defendant.

The question of the admissibility of this evidence is raised by appropriate objections and exceptions. We think it was too remote and that it afforded no basis for any inference that the defendant desired to get rid of his wife by reason of his preference for any other woman. The rule is well established that when a husband is charged with the murder of his wife it is competent to show his relations with a paramour. (People v. Scott, 153 N. Y. 40, 50, 12 N. Y. Crim. 354.) The reason of the rule is stated to be that such evidence tends to establish the absence of affection for the wife and a motive for getting rid of her. The rule, however, does not extend so far as to permit proof of mere temporary intimacy with a prostitute for the same purpose; particularly where such intimacy has existed at a time when the husband and wife were voluntarily living apart. The learned district attorney seeks to sustain the admission of the evidence under consideration by reference to the case of People v. Montgomery (176 N. Y. 219, 225), where it was said: " It is the settled law of this state that upon a trial for the murder of a husband or wife, the improper relations of the accused survivor with persons of the opposite sex may be given in evidence upon the subject of motive." Taken literally and without reference to the context this statement would extend to a single illicit sexual act however remote it might be in point of time. That such was not the meaning of the court is apparent

from the reason of the rule as subsequently stated by Judge WERNER and the character of the cases cited in support of it. Evidence of this character is admissible, he says, because it tends " to repel the presumption of love and affection that arises out of the marital relation, and to establish a motive for the desire to get rid of one who, under normal conditions, would be the natural object of kindness and protection." (p. 226.) It may be added that it is only when the evidence has this tendency that it should be received at all; and the cases cited were none of them simply temporary aberrations from the path of virtue however reprehensible these must be deemed, but they generally involved a relation like that of a man with his mistress or a notorious liason in open disregard of the husband's duties toward his wife, implying a preference for another woman the influence of which might lead a husband to desire to put his wife out of the way.

There was nothing of this character in the defendant's relations over four years before the trial with the woman whom he met at Hornell. Her vague testimony to the effect that he might have made the remark or written to her that they " might be nearer to each other or something like that " is not worthy of serious consideration as tending to show that he contemplated marriage with a woman who was evidently the inmate of a common house of prostitution and that he was willing to kill his wife in order to enjoy her society. Nor were the defendant's visits to Bonita La Marez during his wife's absence in the summer of 1910 any more pertinent upon the question of motive. Indeed, as the testimony on this subject appears in the record it is necessary to resort to the purest speculation to infer that any sexual improprieties were involved in these visits. The jury, however, were invited thus to speculate by placing such evidence before them.

A second error was committed in receiving the evidence which was offered for the purpose of showing that the defendant

had endeavored to escape from the Warsaw jail, where he was imprisoned upon the present charge against him. Five prisoners, including the defendant, were kept in the same corridor during the day time. In December, 1911, the sheriff found in this corridor a file, three large spoons, a piece of wire and a buttonhook. The spoons had been filed into a shape resembling that of the key which unlocked the corridor, and two of the defendant's fellow-prisoners testified that he had assisted in using the file upon the spoons in order to change them into the shape which they presented when offered in evidence. Most of the spoons were in the corridor when the defendant was brought to the jail and some of the other prisoners had been working on them before the defendant was admitted and it did not appear that he had participated in any conversation relative to a plot to escape or anything of the kind. The mere participation of a new prisoner in the fashioning of a possible instrument of escape which previous inmates of the jail had begun to construct before his advent cannot be regarded as evidence of the guilt of such new prisoner within the rule which permits an inference of guilt from an attempt to escape arrest or incarceration. It would be preposterous to say of the act of the defendant as was said of an attempt to escape in People v. Rathbun, 21 Wendell, 509, 519, that the attempt " implies guilt, and operates against the party like a confession." It had no real significance on the question of the defendant's guilt or innocence and the jury should not have been allowed to consider it.

Both the errors which have been considered might possibly be disregarded under section 542 of the Code of Criminal Procedure which empowers the court to give judgment upon the appeal without regard to technical errors or defects or to exceptions which do not affect the substantial rights of the parties, although it may be said that a multiplication of errors

even of a technical character may make them so numerous that when considered together they cannot be deemed harmless.

We now come to the consideration of an objection, however, which if it be well taken is in the view of a majority of the court fatal to the judgment. Upon the cross-examination of the defendant, after he had been questioned in regard to the statement which he attributed to his wife, that she was in the family way by Traber, he was questioned and answered as follows: " Q. So this simmers down, does it, to your contention that this act was done by you simply because she told you of that? Is that so? A. It must be. I had no other information as to her condition except what she told me, in no way, shape or form." It was manifest from this answer, and what the witness had previously stated in regard to his wife's declaration concerning her relations with Traber, that he wanted the jury to understand that he was incensed by these declarations as a husband naturally would be and that, in consequence of the anger thereby induced, he shot his wife in the heat of passion, enraged at her confession of adultery but without deliberation or any premeditated intent to cause her death.

This being the defendant's position, the district attorney contended that any fact which rendered it improbable that the wife would make such a statement in reference to her conduct was relevant to the issue. With this view, over objection and exception, he introduced in rebuttal the testimony of two women as to the condition of the wife's clothing indicating that menstruation had not ceased at the period to which her alleged declaration referred; and the still more important testimony of Dr. Goodwin and Dr. Brownell, who examined the remains of the wife, which had been exhumed during the trial at the direction of the district attorney, and ascertained from their examination of the uterus that the wife was not pregnant at the time of her death.

The most important question upon this appeal is whether

this evidence of these two women and these doctors was properly received.   The argument in favor of its admissibility is that it was improbable that the wife would have declared herself to be pregnant if such was not the fact; and hence that proof that she was not pregnant tended to show that the defendant was not testifying truthfully in regard to the statement by the wife relied upon as an excuse for his murderous assault.

Professor Wigmore, with his characteristic ability, argues in favor of the proposition that the objective truth of a reported fact relied upon as inducing the action of a defendant may sometimes be relevant, and says that this seems clear " when the non-existence of the fact is offered as tending to show that the witness testifying to the communication of the alleged fact is not testifying truly." (5 Wigmore on Evidence, pp. 30, 31.)   On this point he cites Knapp v. State (168 Ind. 153, 155), a murder case where the plea was self-defense. The defendant testified to having heard before the affray that the deceased while attempting to arrest an old man had clubbed him to death.   This fact if true was admissible as evidence of the defendant's state of mind.   The prosecution offered to show that in truth the old man had not been clubbed but had died of senility and alcoholism.   This was admitted as tending to show the improbability of the clubbing having occurred, and, therefore, the improbability that the defendant had heard of it by report or rumor.

The principle applied in this Indiana case is precisely analogous to that which must be applied in the case at bar if the judgment is to be upheld.   It also finds support in Commonwealth v. Hourigan (89 Ky. 305), which was a prosecution for murder in the first degree, where the defendant was a physician.   He testified that about a year before the killing the deceased applied to him to prescribe for a young lady, telling him in substance that having seduced her he had given her medicine from which she was suffering, and that he wanted

the defendant to relieve her. Upon such refusal, according to the testimony of the defendant, the deceased became very angry at him, threatened to whip him and said he would make him sorry for it. The commonwealth, by way of contradiction, offered to prove by the young lady, her mother and stepfather that at the time indicated there was nothing the matter with her. The Court of Appeals of Kentucky held that the proof thus offered was admissible. " It is true their testimony would not have shown conclusively that the conversation as detailed by the accused never took place, but it would have so tended, and while but an indirect contradiction, yet it was competent to enable the jury to judge of the probability of its ever having taken place."

While conceding that the non-existence of the facts said to have been declared by the wife is a circumstance of probative force tending to some extent at least to render it improbable that she actually made the statement attributed to her, the court is of opinion that evidence of this character is inadmissible. It introduces a collateral issue into the case tending to obscure the main issue in the minds of the jury, to lead them away from the principal matters which require their attention and to protract trials to an unreasonable extent without any corresponding advantage to any one concerned. The doctrine applicable here is well stated by Professor James B. Thayer in his " Preliminary Treatise on Evidence at the Common Law " (p. 516), as follows: " The law of evidence undoubtedly requires that evidence to a jury shall be clearly relevant, and not merely slightly so; it must not barely afford a basis for conjecture, but for real belief; it must not merely be remotely relevant, but proximately so. Again, it must not unnecessarily complicate the case, or too much tend to confuse, mislead, or tire the minds of that untrained tribunal, the jury, or to withdraw their attention too much from the real issues of the case." Pursuing the same line of thought he points out

that evidence, although probative, may be too slight, conjectural or remote to be admissible or may complicate and confuse the case too much, the rule being that the law forbids unnecessary complication, delay and tediousness.

Authoritative decisions hostile in principle to the admissibility of such evidence have been rendered by the courts of last resort in California, Kentucky and Texas; and there is an expression of opinion to the same effect in a case in this court.

In People v. Hurtado (63 Cal. 288) the defendant had been convicted of murder in the first degree. The wife of the defendant as a witness in his behalf testified that she confessed to him before the homicide that she had been guilty of adultery with the deceased and that the confession was followed by great emotional disturbance on the part of the defendant. The defendant offered to prove, as corroboration of the testimony of the defendant's wife that she had confessed adultery, the independent fact that she had been seen entering a house of ill-fame in company with the deceased. The trial court sustained the objection of the prosecution to this evidence, and the Supreme Court of California upheld the ruling. "We know of no principle," said McKINSTRY, J., "which would permit defendant to strengthen or bolster up the statement of the witness that she had declared to defendant she had committed adultery, by proving that, in fact, she had committed adultery. *Evidence that she had committed adultery would not tend to prove that she confessed to her husband she had committed adultery.*"

In Shipp v. Commonwealth (124 Ky. 643) the appellant had been convicted of the murder of one Smith. The plea was not guilty on the ground of insanity, and, in support of this plea, he testified that on the Saturday preceding the Monday, which was the day of the killing, his wife confessed to him her sexual misconduct with Smith. He also offered to

prove by his son that the boy had heard his mother confess
her intimacy with the deceased. This the trial court refused
to admit, but notwithstanding the refusal " the commonwealth
was allowed to prove in rebuttal by some twenty or thirty
witnesses, the best citizens of the town and surrounding com-
munity, that Mrs. Shipp was a lady whose reputation for virtue
and chastity was good and above reproach." The appellant
complained of this; and the Kentucky Court of Appeals con-
cluded " upon reason and authority analogous to the point in
question, that the testimony of the wife's good character was
incompetent and the court should not have allowed it to go to
the jury. The wife was neither a party to the action, nor a
witness in the case; her reputation for chastity was not in
issue."

In People v. Webster (139 N. Y. 73, 10 N. Y. Crim. 486)
the defendant was tried for murder in the first degree but was
convicted of manslaughter. He was accused of having killed
one Charles E. Goodwin. He admitted the killing but con-
tended that it was justifiable on the ground of self-defense.
The wife of the defendant was a witness in his behalf and
testified that just prior to the homicide she had told him that
the deceased had made improper advances to her. While the
wife was under examination a discussion arose as to whether
she should be allowed to state what the deceased had actually
done. This the court would not permit but said that she
might state what she told the defendant that the deceased had
done but could not state whether the deceased had in fact done
the things mentioned. " That the witness might state any
communication she made to the defendant at or about the time
or shortly prior to the occurrence as to anything that the
deceased did; that the only material thing was the communica-
tion, and it was entirely immaterial whether the things disclosed
actually happened." (p. 80.) The court also added that the
jury must not consider the question whether the communi-

cations made by the wife were true; that they were admitted only to show the condition of the defendant's mind when he fired the shot.

In the Court of Appeals it was not claimed that any error was committed in the reception or rejection of evidence upon this branch of the case, but it was argued that the remarks of the trial judge were unfair and prejudicial to the defense because they conveyed to the jury the impression that the judge believed the defendant to be guilty of the crime of murder. As to this Judge MAYNARD, writing for this court, said: "We do not think the language of the learned trial judge is fairly susceptible of such an interpretation. It was no more than a clear-cut statement of a most pertinent legal principle. The charge was murder, the defense a justification, and the court merely said, in terms not liable to misconstruction, that no wrong done by the deceased to the wife was available as a justification, but if the defendant believed that the wrong had been committed, the state of mind induced by the belief might be considered in determining the motive and intent of his actions." (p. 81.)

It would be contrary to the teachings of judicial experience to assume that the evidence that Mrs. Harris was not in fact pregnant, was without influence upon the minds of the jury. It was brought out at the very close of the case. The frozen body had been exhumed only a few hours previously for the purpose of the examination which the medical witnesses described; and the jurors retired to deliberate with the picture of this ghastly occurrence vividly impressed upon the imagination. Whatever might be said of the other errors which have been considered in favor of disregarding them in the exercise of our power under section 542 of the Code of Criminal Procedure, no such view can be taken of this evidence. Its reception was so clearly harmful as to entitle the defendant to a new trial.

The judgment of conviction should, therefore, be reversed, and a new trial ordered.

CULLEN, Ch. J., WERNER, HISCOCK, CHASE and HOGAN, JJ., concur; COLLIN, J., absent.

Judgment of conviction reversed, etc.